[No. D022144. Fourth Dist., Div. One. Oct. 7, 1997.]

E. F. BRADY COMPANY, INC., Plaintiff and Appellant, v.
M. H. GOLDEN COMPANY et al., Defendants and Appellants.

**COUNSEL**

Corona & Balistreri, Rick D. Corona and Sean Brew for Plaintiff and Appellant.

Hillyer & Irwin, James G. Ehlers and Deb C. Pedersdotter for Defendants and Appellants.

**OPINION**

**HALLER, J.**—The State of California (state) selected M. H. Golden Company (Golden) as the general contractor on a public construction project after a competitive bid process. Golden subsequently learned the lath and plaster subcontractor listed on its bid would be unable to perform. It then entered into negotiations with another subcontractor, E. F. Brady Company, Inc. (Brady). Although Golden initially notified the state it intended to use Brady, Golden never asked the state to approve Brady and eventually selected different entities to perform the subcontract job.

Brady sued Golden, asserting violation of the Subletting and Subcontracting Fair Practices Act (Act). (Pub. Contract Code,[1] § 4100 et seq.) Brady alleged Golden violated the Act by failing to obtain the state's approval to substitute another subcontractor for Brady. The court, sitting without a jury, found Golden violated the Act and awarded Brady $161,774.41.

Golden appeals. We determine Brady was not a protected subcontractor under the Act and therefore Brady did not have a right to recover damages. Accordingly, we reverse the judgment. This determination renders it unnecessary to reach Golden's alternate contentions or Brady's cross-appeal on damages.

FACTS[2]

In May 1991, Golden submitted a bid to the state on a construction project involving the Del Mar racetrack grandstand. Golden included a list of each of the subcontractors whose cost was greater than one-half of 1 percent of

---

[1]All further statutory references are to the Public Contract Code.

[2]We set forth only those facts relevant to the legal issue addressed in this appeal.

the total bid. As part of that list, Golden identified Jordan Fireproofing, Inc. (Jordan) as its lath, plaster, drywall and fireproofing subcontractor at a price of $6.4 million plus a 1 percent bond.[3]

Golden was the low bidder on the project. On May 22, 1991, Golden entered into a contract with the state for $56,250,000.

It soon became apparent that Jordan could not obtain the necessary payment and performance bonds. Brady learned of Jordan's problems and notified Golden it was interested in performing as the subcontractor. Brady and Golden began negotiating a proposed subcontract. On July 26, 1991, the parties reached a tentative agreement on the terms of a subcontract agreement, including the price, $6.4 million plus a 1 percent bond.

Eleven days later, on August 6, 1991, Golden wrote a letter to the state, "requesting that . . . Jordan . . . be removed from the subcontractor list" because it has not been able to procure the necessary bonds. The letter also stated "[i]t is the intention of [Golden] to substitute [Brady] to perform the requirements of [the lath, plaster, drywall subcontract]."

Jordan objected to its proposed removal and requested an administrative hearing. A hearing was scheduled for September 6, 1991.

On August 22, 1991, Golden sent Brady a subcontract agreement and requested that Brady management sign and return the contract within 10 days. The contract contained a provision conditioning the agreement on the state approving Golden's substitution request and stating the contract was void if such permission was not received within 45 days.

Six days later, on August 28, 1991, Brady returned the subcontract unsigned, objecting to the 45-day state approval condition and stating the agreement should take effect no later than September 1. Brady believed negotiations would continue and that it would ultimately enter into a contract with Golden. Golden, however, became concerned that Brady did not want to perform the contract on the agreed price.

One week later, on September 5, 1991, Golden's counsel wrote a letter to the state in preparation for the administrative hearing, specifying the statutory grounds for removing Jordan as a listed subcontractor. Golden requested approval to "substitute an alternative subcontractor," without identifying the replacement subcontractor.

---

[3]Although Jordan identified a 4.5 percent bond in its bid and Golden was responsible for paying that bond, Golden did not use that figure in its bid.

The next day, a hearing was held before state hearing officer Michael Mattoch. The purpose of the hearing was to determine whether Golden had a valid statutory basis to remove Jordan as a listed subcontractor. The issue of which entity would replace Jordan was never raised and Brady was not mentioned at the hearing.[4] The hearing officer took the matter under submission.

The next week, on September 13, 1991, the hearing officer granted Golden's request "to substitute an alternative subcontractor for its listed subcontractor [Jordan] . . . ." The notice did not identify a replacement subcontractor. The hearing officer subsequently issued a detailed written opinion, explaining the statutory grounds for removing Jordan. The opinion again characterized Golden's substitution request as a "request to substitute an alternative subcontractor" without identifying the replacement subcontractor.

During the next two weeks, Golden announced at job site meetings that it would not be contracting with Brady and would rebid Jordan's portion of the work.

On September 24, 1991, Golden issued an invitation for bids to the subcontracting community for Jordan's work. Golden did not notify Brady of this action.

In November or December 1991, Golden entered into written subcontracts with Advanced Systems (Advanced) and Coffman Enterprises, Inc. (Coffman) to perform the lath, plaster, drywall and fireproofing work.

In early January, Brady's general counsel, Murray Helm, spoke with Roger Brown, a state contracts manager for the Del Mar grandstand project. In response to Helm's question, Brown said that Brady was Golden's "currently listed subcontractor to be substituted in place of Jordan . . . ." Brown based his answer on Golden's August 6 letter and was unaware the state had never approved Brady as the replacement subcontractor.[5]

Shortly thereafter, the state learned Advanced and Coffman were at the job site, yet Golden had never requested or received approval to use these

---

[4]Brady's assertion that the hearing officer "officially stated . . . that Brady was to be the replacement subcontractor for Jordan" is not supported by the record. Brady cites only to a declaration submitted in opposition to Golden's demurrer. The declaration was not before the court at trial.

[5]When Brown later learned that Golden had never made a further request for approval to use Brady, he concluded that Brady was not the listed subcontractor. At trial, Brown said Brady was never a listed subcontractor.

entities as subcontractors. The state gave immediate verbal approval for Advanced and Coffman to begin work. On February 11, 1992, the state formally approved Advanced and Coffman. The total combined cost to Golden for the Advanced and Coffman contracts was $6,537,000.

Two weeks later, Brady filed an action against Golden, asserting a single cause of action—violation of the Act. After a nonjury trial, the court issued a statement of decision finding (1) Brady was protected by the Act because it was a "listed" subcontractor within the meaning of section 4107, subdivision (a); (2) Golden violated the Act by failing to seek the state's consent to substitute another subcontractor in place of Brady; (3) Brady was not barred from bringing the action by waiver or estoppel principles; and (4) Brady suffered damages in the amount of $161,774.41.[6]

Golden appeals.

## DISCUSSION

Brady has never asserted a contractual right to perform the subcontract work. Brady instead relied exclusively on the Act to establish an entitlement to serve as Golden's subcontractor. Golden contends Brady was not a protected subcontractor under the Act and therefore Brady had no right to perform the subcontract or recover damages against Golden. For the reasons set forth below, we agree and reverse.

### A. Statutory Overview

█ Under the Act, a general contractor submitting a bid on a public contract must list each subcontractor that will perform more than one-half of 1 percent of the total bid. (§ 4104, subd. (a).) The listing does not create an express or implied contract between the contractor and subcontractor. (*Southern Cal. Acoustics Co.* v. *C.V. Holder, Inc.* (1969) 71 Cal.2d 719, 722-723 [79 Cal.Rptr. 319, 456 P.2d 975]; *Interior Systems, Inc.* v. *Del E. Webb Corp.* (1981) 121 Cal.App.3d 312, 315 [175 Cal.Rptr. 301].) Once the general contractor's bid is accepted, however, the general contractor has a *statutory duty* to use the listed subcontractor, unless one of seven statutory enumerated circumstances exist.[7] (§ 4107; *Southern Cal. Acoustics Co., supra,* 71 Cal.2d at p. 725.) Each of these statutory circumstances pertains to the subcontractor's inability or unwillingness to perform the subcontract.

---

[6]The court initially awarded damages of $824,792.80, but later reduced that amount to reflect the evidence at trial.

[7]These circumstances are:

"(1) When the subcontractor listed in the bid after having had a reasonable opportunity to do so fails or refuses to execute a written contract, when that written contract . . . is presented to the subcontractor by the prime contractor.

If the contractor believes one of the statutory grounds exists, it may seek approval to substitute another subcontractor by notifying the awarding authority. (§ 4107, subds. (a) & (b).) Before approving a contractor's request for the substitution, the awarding authority must "give notice in writing to the listed subcontractor . . . ." (§ 4107, subd. (a).) The listed subcontractor may then submit written objections. If written objections are filed, the awarding authority must hold a hearing on the substitution request. (*Ibid.*)

The Act thus binds a contractor to its listed subcontractors, even though the parties have not yet entered into a contractual relationship. If the named subcontractor is unlawfully removed or substituted for a reason not authorized by the statute, the "removal permits the subcontractor to maintain a cause of action against the prime contractor." (*Interior Systems, Inc.* v. *Del E. Webb Corp., supra,* 121 Cal.App.3d at p. 315.) As explained by our Supreme Court, the Act "confers the right on the listed subcontractor to perform the subcontract unless statutory grounds for a valid substitution exist. . . . [T]hat right may be enforced by an action for damages against the prime contractor to recover the benefit of the bargain the listed subcontractor would have realized had he not wrongfully been deprived of the subcontract." (*Southern Cal. Acoustics Co.* v. *C.V. Holder, Inc., supra,* 71 Cal.2d at p. 727.)

■ The Legislature enacted this statutory scheme to address perceived problems with subcontractor financial solvency and the quality of subcontractor work on public projects. In particular, the Legislature wanted to (1) ensure the awarding authority would have the "opportunity to . . . investigate and approve the initial subcontractors and *any proposed substitutions*" (*Southern Cal. Acoustics Co.* v. *C.V. Holder, Inc., supra,* 71 Cal.2d at p. 725, italics added) and (2) prevent "bid shopping" and "bid peddling" after the prime contract has been awarded. (*Id.* at p. 726.) "Bid shopping is the use of the low bid already received by the general contractor to pressure other subcontractors into submitting even lower bids. Bid peddling . . . is an attempt by a subcontractor to undercut known bids already submitted to the

---

"(2) When the listed subcontractor becomes bankrupt or insolvent.

"(3) When the listed subcontractor fails or refuses to perform his or her subcontract.

"(4) When the listed subcontractor fails or refuses to meet the bond requirements of the prime contractor . . . .

"(5) When the prime contractor demonstrates to the awarding authority, or its duly authorized officer, . . . that the name of the subcontractor was listed as the result of an inadvertent clerical error.

"(6) When the listed subcontractor is not licensed pursuant to the Contractors License Law.

"(7) When the awarding authority, or its duly authorized officer, determines that the work performed by the listed subcontractor is substantially unsatisfactory and not in substantial accordance with the plans and specifications, or that the subcontractor is substantially delaying or disrupting the progress of the work." (§ 4107, subd. (a.)

general contractor in order to procure the job." (*Id.* at p. 726, fn. 7.) "These practices often result in financial difficulties for subcontractors and poor workmanship . . . ." (*Cal-Air Conditioning, Inc.* v. *Auburn Union School Dist.* (1993) 21 Cal.App.4th 655, 661 [26 Cal.Rptr.2d 703].)

## B. *Analysis*

■ The threshold issue here is whether Brady was a protected subcontractor under the Act. Under the Act's provisions, only a contractor *listed* on the original bid has a "right" to the subcontractor job (absent one of the seven statutory enumerated circumstances). A contractor that was never "listed" has no statutory right to perform the job and therefore may not recover damages under the Act.

A "listed" subcontractor is an entity that is identified by the contractor in its original bid to a public agency. Jordan, and not Brady, was the original listed subcontractor in this case. Brady nonetheless argues a second subcontractor may rise to the level of a "listed" subcontractor *if the originally listed subcontractor is removed and the second subcontractor becomes the replacement subcontractor.*

While the Act does not define a replacement subcontractor's rights, Brady's argument is consistent with the statutory scheme. If a replacement subcontractor could be removed for any reason and replaced by a subcontractor who has not been evaluated and approved by the awarding authority, the public would not be protected because there would be no opportunity for the contracting agency to evaluate the second subcontractor's performance and financial abilities. The public and subcontracting community would further be put at risk because the contractor would be free to "bid shop" to pressure other subcontractors to perform the work for a price under the bid price.

We need not determine, however, the precise scope of a replacement contractor's rights because a fundamental precept of Brady's argument is missing in this case—Brady never became the "replacement" subcontractor since it was never approved by the state. Although Golden initially informed the state that it intended to select Brady, it never asked for the state to approve Brady. Instead, Golden modified its request by seeking approval at the administrative hearing to substitute for Jordan an unidentified subcontractor. At trial, the state representatives confirmed Brady was never a listed subcontractor since the state was never asked to approve, and did not approve, Brady as the subcontractor replacement.

The Act specifically requires the awarding authority to approve the particular entity that will serve as the substitute subcontractor. (See *Fred J.*

*Early, Jr., Co.* v. *County Sanitation Dist.* (1963) 214 Cal.App.2d 505, 507 [29 Cal.Rptr. 633].) Absent approval, a second subcontractor may not perform work on the public project. (§ 4107.) Since the Act requires the contracting agency's approval and a primary purpose of the Act is to ensure a public entity has the opportunity to approve a subcontractor, the Act cannot bind a contractor to a subcontractor before that approval has been given. Until a subcontractor has been replaced *and a new subcontractor has been approved,* the second subcontractor has no statutory right to perform the subcontract and therefore it is not entitled to damages if it is not awarded the job.

Brady argues it was sufficient that (1) Golden "intended" that Brady become the listed subcontractor; and (2) the state "understood that Brady *was to become* the listed subcontractor." These facts are not equivalent to approval. The statute requires that the contracting authority affirmatively approve a replacement; notice or a subjective "understanding" of the contractor's future intent is not sufficient.

The court's finding that the state "considered Brady to be the listed substituted subcontractor" is not supported by the record. Hearing officer Mattoch specifically testified he was "not told who would be [the replacement subcontractor] at the time of the [September 6] hearing" and therefore he could not have approved Brady as the replacement. Further, although Brady's general counsel testified that state representative Brown told him in January 1992 that Brady was the "listed" subcontractor, at trial Brown explained that he had based this statement on the erroneous assumption that Brady had been approved as the replacement subcontractor. Brown testified Brady was never the listed subcontractor.

Brady alternatively argues it was entitled to damages because Golden violated the Act by failing to obtain approval for the subcontractor replacement at the same time the state granted the substitution request. Brady stresses that absent simultaneous approval for removal and replacement, a general contractor will have the opportunity to "bid shop," a practice specifically prohibited by the Act.

Section 4107, subdivisions (a) and (b) state: "No prime contractor whose bid is accepted shall: [¶] (a) Substitute any person as subcontractor in place of the subcontractor listed in the original bid, except that the awarding authority . . . may . . . consent to the substitution of another person as a subcontractor in any of the [enumerated circumstances for removal of a listed subcontractor]: [¶ . . . [¶] (b) Permit any subcontract to be voluntarily assigned or transferred or allow it to be performed by anyone other than the original subcontractor listed in the original bid, without the consent of the awarding authority, or its duly authorized officer."

This language suggests the Legislature intended a replacement subcontractor should be named and approved when the awarding authority grants a substitution request. However, the fact the contractor and the state did not follow this procedure does not mean a subcontractor has the right to force the contractor to award *it* a contract. Such a rule would defeat the purposes of the Act. It would provide a subcontractor *that never received approval* with the right to force the contractor to award it the subcontract. Nothing in the statutory scheme supports such extension of the statutory remedies.[8]

Brady's reliance on section 4103, subdivision (a) is likewise misplaced. Section 4103, subdivision (a) provides "[n]othing in this chapter limits or diminishes any rights or remedies, either legal or equitable, which [¶] . . . [a]n original or substituted subcontractor may have against the prime contractor, his or her successors or assigns." That section confirms the Act does not displace any common law or other statutory rights an original or replacement subcontractor may have. It does not add to the statutory rights provided by the Act.

### DISPOSITION

Judgment reversed. Brady to bear costs on appeal.

Kremer, P. J., and Nares, J., concurred.

---

[8]We emphasize our conclusion that Brady has no right to damages here should not be interpreted as upholding the correctness of the procedure used in this case. The Act does not appear to permit an awarding authority to approve the removal of a listed subcontractor without simultaneously approving a specific replacement subcontractor. We note a subcontractor that believes an awarding authority has violated the Act's statutory mandate may be entitled to bring an administrative mandamus under Code of Civil Procedure section 1094.5. (See *Interior Systems, Inc.* v. *Del E. Webb Corp., supra,* 121 Cal.App.3d at p. 318.)