72 Cal.Rptr.3d 570 (2008)
160 Cal.App.4th 188
TITAN ELECTRIC CORPORATION, Plaintiff and Appellant,
v.
LOS ANGELES UNIFIED SCHOOL DISTRICT and Kemp Bros. Construction, Inc., Defendants and Respondents.
No. B194748.
Court of Appeal of California, Second District, Division Four.
February 19, 2008.
*573 Ross, Dixon & Bell, Kevin F. Kieffer and Lindsay J. Reese, San Diego, for Plaintiff and Appellant.
Orback, Huff & Suarez, David M. Huff, Colin E. Barr, Los Angeles, and Marley S. Fox, for Defendant and Respondent Los Angeles Unified School District.
Carroll, Kelly, Trotter, Franzen & McKenna, Richard D. Carroll, David P. Pruett, Long Beach; Benedon & Serlin, Gerald M. Serlin and Douglas G. Benedon, Los Angeles, for Defendant and Respondent Kemp Bros. Construction, Inc.
WILLHITE, Acting P.J.
Public Contract Code section 4107[1] provides that the prime contractor on a public works project cannot "[substitute a person as subcontractor in place of the subcontractor listed in the original bid" unless any of nine listed circumstances exists and the awarding authority consents. (§ 4107, subd. (a).) The statute further provides that absent the awarding authority's consent, the prime contractor cannot "allow [a subcontract] to be performed by anyone other than the original subcontractor listed in the original bid." (§ 4107, subd. (b).)
In the instant case, Kemp Bros. Construction, Inc. (Kemp) was the prime contractor for the Los Angeles Unified School District (the District) on two public works construction projects: the Huntington Park Elementary School (the Huntington Park project) and the Los Angeles Center for Enriched Studies (the LACES project). Titan Electric Corporation (Titan) was Kemp's electrical subcontractor on the projects.
During construction, Kemp petitioned under section 4107 to replace Titan with another subcontractor on both projects, alleging inter alia that Titan had failed or refused to perform its subcontracts (id., subd. (a)(3)) and substantially delayed or disrupted the progress of work (id., subd. (a)(7)). Titan opposed the substitution requests and demanded an administrative hearing. Following several continuances to accommodate the parties' settlement talks, the District held separate hearings on each substitution request. By that time, another electrical subcontractor hired by Kemp had completed the subcontract work on both projects.
Following the hearings, the District issued decisions on each project (initial decisions, followed by amended decisions) granting Kemp's request for substitution. The District also denied Titan's request for rehearing. Titan filed petitions for writ of administrative mandate in the superior court challenging the District's decisions permitting substitution. The superior court denied the petitions, and Titan now appeals.
*574 Titan contends that section 4107, subdivision (b), prohibited Kemp from replacing Titan before the District consented to the substitution, and that the District had no authority to consent to substitution after another subcontractor had completed the work. Titan asks us to hold that Kemp's substitution of Titan was wrongful as a matter of law and that LAUSD's ex post facto consent was unauthorized.
We hold that section 4107 contemplates that the awarding authority's consent to substituting out a listed subcontractor and substituting in a proposed replacement will occur before the prime contractor permits the replacement to perform any work. However, a deviation from this chronology, such as in the instant case, is permissible so long as the procedure used actually complies with the substance of the reasonable objectives of the statute: namely, the prevention of bid peddling and bid shopping after the award of a public works contract, and the providing of an opportunity to the awarding authority to investigate the proposed replacement subcontractor before consenting to substitution.

PROCEDURAL AND FACTUAL BACKGROUND[2]

Titan's Subcontracts
In March 2003, Kemp entered prime contracts with the District for the Huntington Park and LACES projects. In April 2003, it entered subcontracts on both projects with Titan under which Titan was to perform the electrical work. Titan's subcontracts obligated Titan to "furnish all labor, materials, equipment and other facilities required to perform the work to' complete" the electrical work on the projects, and to "prosecute its work ... in accordance with [Kemp's] progress schedule." Construction of the two projects proceeded concurrently.

Kemp's Agreement to Advance Payroll to Titan
Beginning in early February 2004, Kemp became dissatisfied with Titan's *575 progress on the Huntington Park project. On February 2, 2004, Kemp sent the first of a series of letters (13 in all) complaining that Titan was behind schedule and insisting that Titan put additional workers on the job.
Kemp's CEO Greg Solaas received a telephone call from Titan's owner John Nelson and Titan's vice-president Don Quillao. Nelson and Quillao explained that Titan could obtain more workers from the International Brotherhood of Electrical Workers (IBEW), but that Titan was in a "cash crunch" and could not fund the extra payroll. Solaas agreed that Titan would cover the payroll for eight workers on the Huntington Park project, and that Kemp would pay weekly advances to Titan to cover the payroll for every other worker that Titan supplied. The agreement was oral and separate from Kemp's subcontracts with Titan. Titan continued to be responsible for the entire payroll on the LACES project.

Kemp's Continued Dissatisfaction with Titan's Progress
In the weeks leading up to April 28, 2004, Kemp made weekly payroll advances to Titan totaling $371,341 for the Huntington Park project. However, in Kemp's view, Titan was still understaffing the job and was behind schedule at the critical stage of the electrical worka view reiterated in ten letters to Titan through April 8, 2004, in which Kemp demanded additional workers and additional shifts. Finally, on April 19, 2004, Kemp wrote: "This last week we were given a revised schedule by Titan Electric for the completion of the low voltage systems so we could again set up the [District] inspections. As of today it appears that Titan and First Fire [a subcontractor of Titan] will again not be ready. [The District] has inspectors set up to start testing the various electrical systems this coming Thursday 04/22/04.... We can not again reschedule these inspections. We are out of time. Titan and First Fire need to work around the clock if need be to complete all work for the Thursday 04/22/04 inspections."

Kemp's Concern Over Titan's Solvency
Kemp's practice had been to pay the weekly advances to Titan on Tuesdays, and Titan would pay the IBEW union employees on Wednesdays. As of Wednesday, April 28, 2004, Kemp had not yet advanced Titan the payroll for the extra workers on the Huntington Park project, a sum which totaled $86,000.
Before making the advance, Kemp's controller, Pat Sullivan, spoke by telephone with Nelson (Titan's owner) and Quillao (Titan's vice president). In the conversation, Sullivan asked why Kemp still had to advance payroll and whether Nelson had a line of credit for the company. Nelson responded that his line of credit was gone and that he had no cash to cover Titan's checks. Sullivan asked for information on Titan's expected profit on the Huntington Park and LACES projects. He later received a fax from Titan stating that Titan expected to lose money on the Huntington Park project, and to make only $30,000 to $40,000 on the LACES project.
Sullivan then reviewed the invoices submitted by Titan to Kemp. He discovered that in April Titan submitted conditional releases and invoices from a material supplier, Main Electric, reflecting that it was owed $200,000 for materials supplied in February and March. Sullivan did not expect the $200,000 debt, because the releases and invoices should have been submitted in the month that the materials were supplied.
Sullivan briefed Solaas, Titan's CEO. They contacted Titan's supplier Main Electric and inquired why the conditional releases *576 in the amount of $200,000 for February and March had not been submitted until April. Main Electric told them that Titan had instructed Main Electric not to supply Kemp with the releases.
Solaas became concerned that if Kemp paid the $86,000 advance, it might not have enough collateral to pay Titan's suppliers (others of whom might not have submitted invoices) and payroll taxes if Titan truly had insufficient funds. He was also concerned that given Titan's apparent financial difficulties, Titan might use the payroll advance to pay other debts. Solaas therefore decided not to make the advance until Kemp sorted out Titan's situation.

Kemp's Withholding of the April 28 Payroll Advance
Quillao (Titan's vice-president) had called several times on April 28 asking when the $86,000 advance would be paid. Late in the afternoon on April 28 Solaas ultimately returned the calls and told Quillao that Kemp would not issue the check until it was able to sort out Titan's situation. Quillao warned that if Titan did not receive the advance, Titan's workers "weren't going to get paid on both jobs and ... were going to stop" work. Solaas asked whether Titan had an available line of credit to cover the payroll. Quillao replied that the credit line was "maxed out," that Titan had no cash, and that Titan could not give Kemp a note on a house in exchange for the advance. Under these circumstances, Solaas refused to issue the advance.

Titan's April 29 Failure to Staff the Projects
Having been informed late on April 28 that Kemp would not make the $86,000 advance on the Huntington Park project, Nelson (Titan's president) instructed Titan's workers on both the Huntington Park and LACES projects to stay home. The next day, April 29, 2004, the only Titan employees who appeared at the Huntington Park and LACES projects were the project manager for the projects, the foremen, and a few other workers looking for their paychecks. Titan also sent one of its drivers to pick up its tools from the sites.
Solaas learned that Titan had concurrently abandoned two other, unrelated projects when the prime contractor on those projects refused to advance funds. On the morning of April 29, Solaas called Quillao and asked what was happening to Titan. Quillao told him that Titan was "going to wind down operations [and] could not afford to do the jobs anymore." He told Solaas that Kemp could "come over to their warehouse, pick up all the light fixtures, all the conduit and everything" for Phase II of the Huntington Park project. Kemp did so.

Kemp's April 29 Requests for Substitution
Later on April 29, 2004, based on Titan's failure to send employees to the project sites, Kemp sent the District written requests under section 4107 to replace Titan on the Huntington Park and LACES projects with another electrical subcontractor, A & R Electric (A & R), and listed A & R's address and contractor's license number. In its requests for substitution, Kemp contended, inter alia, that Titan had failed or refused to perform its subcontracts (4107, subd. (a)(3)) and substantially delayed or disrupted the progress of work (id., subd. (a)(7)). As in the Huntington Park project, the electrical work on the LACES project was on "critical path," and it was imperative that Titan complete its work in order to keep the project on schedule.

*577 Kemp's April 30 Letters to the IBEW

Solaas wanted to ensure that Titan's employees on the projects got paid, and that the IBEW union, which supplied electrical workers on the projects, knew it. To do so, Kemp needed a union subcontractor as a vehicle for payment. A & R Electric was a union subcontractor with which Kemp had worked several times over the past 10 to 15 years. Solaas knew A & R to be reputable and trusted it to receive the $86,000 advance and pay it out to Titan's employees. Therefore, he asked A & R whether it would pay Titan's workers if Kemp advanced the funds. A & R was reluctant to get involved, but agreed. Thus, on the morning of April 30, Kemp faxed separate letters to the IBEW, with copies to Titan, informing the IBEW that Kemp had "hired ... A & R Electric to replace Titan Electric for refusing to complete [the Huntington Park and LACES projects]. [¶] We have instructed A & R Electric to cover the payroll for Titan Electric for the period of April 19 thru 23, 2004 for the ... project[s]."
According to Solaas, although the letters to the IBEW stated that Kemp had hired A & R, Kemp had not entered a contract with A & R to perform work under Titan's subcontracts. Rather, Kemp was simply using A & R to transmit the payroll advance to Titan's employees, and Kemp had agreed with A & R that if Titan failed to return to work, Kemp would pay A & R on a time-and-materials basis to complete the work. Kemp, however, did not enter a formal time-and-materials contract with A & R. Further, Kemp did not have A & R perform any work on the Huntington Park and LACES worksites on April 29 or April 30, and not until May 4, 2004, did Kemp issue its first check to A & R. That check was to pay Titan's employees for the work they had performed under Titan's subcontract.

Kemp's April 30 Notices to Titan to Cure
Later on the morning of April 30, 2004, Kemp faxed Titan notices to cure for both projects, stating: "On April 28, 2004, Titan Electric advised Kemp Bros, that it was abandoning the referenced project due to its inability to pay its electrical employees working on the project. [¶] As a result of Titan Electric's actions, you are hereby given notice to cure this condition within forty-eight (48) hours from the time of abandonment in accordance with your Subcontract Agreement ..., Section 14, Paragraph 14.1.2. Failure to cure this condition will result in immediate termination and substitution." Titan never responded to Kemp's notices to cure, and did not return to the job sites.

Scheduling the Administrative Hearing
The same day that Kemp faxed the IBEW letters and the notices to cure (April 30, 2004), the District faxed Titan notices that it had received requests from Kemp for substitution on the Huntington Park and LACES projects. On May 5, 2004, Titan requested a hearing on each substitution request. The District initially set the hearings for June 2, 2004. However at Kemp's request (made on behalf of both parties) the hearings were postponed to accommodate settlement talks.[3] Ultimately, *578 the hearings were held on August 31, 2004, before a District hearing officer. By then, the electrical work covered by Titan's subcontracts on both projects had been completed by A & R on a time-and-materials basis. According to Solaas and Sullivan, as a result of A & R having to complete the work, Kemp stood to lose on the electrical subcontracting $631,000 for the Huntington Park project and $643,000 for the LACES project.

Titan Disputes Kemp's Evidence
At the administrative hearings, Kemp presented evidence setting forth the foregoing history. Titan disputed certain points of Kemp's showing primarily through the testimony of its president, John Nelson. Nelson testified that he was not informed until late on April 28, 2004, that Kemp would not be advancing the payroll for the extra workers on the Huntington Park project. Nelson instructed the workers on both projects not to go to work on April 29. Instead, Nelson sent the project manager and foremen on the projects to the work sites, and sent his driver to pick up Titan's tools in order to secure them until the problems were worked out.
On April 29, Nelson called Solaas, but was told he was unavailable. Nelson never called back, and never responded to the April 30 notices to cure. According to Nelson, the notices to cure were a sham, because Titan had effectively been replaced: on April 30, Nelson received a copy of Kemp's letters to the IBEW stating that Kemp had hired A & R, and Nelson also learned that A & R had hired most of Titan's workers, including Titan's project manager on both projects and the foremen. Further, Nelson was informed by his project manager that A & R started work on April 30.
Nelson had the ability to pay the employees on the Huntington Park and LACES projects, though he "would have had to make some arrangements." He did not have a credit line, but did have "private *579 sources" of financing. Even though he could have gone to those sources, he refused to cover the payroll on the jobs because, in his view, he was "already financing the Huntington Park job to the tune of $900 grand and ... wasn't going to finance any more." That is, Nelson considered the payroll advances to be advances for work already completed, and Titan had not yet received payment for more than $800,000 it had billed for completed work. Nelson admitted that on the same day he directed workers not to appear at the LACES and Huntington Park jobsites, he also directed workers not to appear at two other unrelated projects.
According to Nelson, Titan had substantially completed its work on both the Huntington Park and LACES projects. Titan intended to complete its work and would have done so but for Kemp's interference by hiring A & R. Nelson denied telling any supplier not to submit invoices timely.
Nelson admitted that as of the date of the hearings, Titan's address was a P.O. box rather than an office, that Titan no longer had any employees, and that he had canceled Titan's insurance on its tools and equipment in May 2004. However, he denied that Titan was bankrupt or out of business. It subcontracted its labor, and was involved in other projects.

The District's Decisions
On November 12, 2004, the District's hearing officer issued substantially identical written decisions granting Kemp's request for substitution on both projects under section 4107, subdivisions (a)(3) and (a)(7). On March 24, 2005, Titan requested a rehearing. On May 19 and 20, 2005, respectively, the hearing officer filed amended decisions with regard to the LACES and Huntington Park projects. The amended decisions amplified the findings supporting substitution. The hearing officer concluded in part that "[o]nce Kemp discontinued early payments to Titan, Titan employees either abandoned the project because they had not been paid by Titan, or because they had been ordered not to report to the [Huntington Park and LACES projects]. Titan failed to perform its subcontract and substantially delayed or disrupted the progress of the work under [§ 4107, subds. (a)(3) and (a)(7)] by failing to provide electricians to work on the project[s] on April 29, 2004, and by failing to respond to Kemp's 48-hour notice to cure. It was apparent during the hearing[s] that Titan made no reasonable effort to timely complete the work Kemp could reasonably expect Titan to perform." Neither the initial nor the amended decisions expressly approved A & R as the replacement subcontractor.
On August 5, 2005, Titan again requested rehearing. Titan contended that it had new evidence, namely, video tapes of the job sites taken on April 30, 2004, and a declaration from Quillao. According to Titan, the video tapes showed that Titan's work was substantially complete on April 30 and that A & R had already begun work. In his declaration, Quillao denied that he told Kemp that Titan was winding down its business, that Titan would not return to work on the projects, or that Kemp should pick up Titan's materials. On August 25, 2005, the District denied Titan's rehearing request.

Titan's Mandate Petitions
Titan filed petitions for administrative mandate in the superior court challenging the District's decisions. The superior court consolidated the petitions and denied them. The court limited its review of the administrative record to the evidence submitted at the administrative hearings. It did not consider the evidence submitted with Titan's August 5, 2005 rehearing request, because that evidence was available at the time of the administrative *580 hearings but not presented by Titan or considered by the District in granting Kemp's substitution requests. The court further ruled that the District did not abuse its discretion in refusing to consider the purportedly new evidence or grant rehearing, because Titan failed to show good cause for failing to produce the evidence at the hearings.[4]
With respect to the District's findings that substitution was justified under section 4107, subdivisions (a)(3) and (a)(7), the court concluded that substantial evidence supported those findings. The court also rejected Titan's contention that because A & R Electric had replaced Titan before the administrative hearings were held, the District lacked jurisdiction to grant the substitution requests. The court reasoned that "[n]othing in the statute ... or ... case authority ... indicates that the awarding authority'[s] jurisdiction to conduct such hearing and decide whether the substitution is ... permitted lapses if the prime contractor brings in another subcontractor before the hearing is held."

DISCUSSION[5]

The Statutory Scheme
The Legislature enacted the Subletting and Subcontracting Fair Practices Act (§ 4100, et seq.), of which section 4107 is a part, to prevent "bid shopping" and "bid peddling" after the award of a public contract[6] and to give the awarding authority the opportunity to investigate and approve the initial subcontractors and any replacements. (§ 4101; see Southern Cal. Acoustics, supra, 71 Cal.2d at pp. 725-726, 79 Cal.Rptr. 319, 456 P.2d 975; E.F. Brady, supra, 58 Cal.App.4th at pp. 189-190, 67 Cal.Rptr.2d 886.) As here relevant, a prime contractor who bids on a public works project must list in its bid each subcontractor who will perform work in an amount "in excess of one-half of 1 percent of the prime contractor's total bid." (`§ 4104, subd. (a)(1).) If the public entity accepts the prime contractor's bid, section 4107 forbids the prime contractor from "[s]ubstitut[ing] a person as subcontractor in place of the subcontractor listed in the original bid, except that the awarding authority, or its duly authorized officer, may ... consent to the substitution of another person as a subcontractor" when any of nine listed circumstances exists. (§ 4107, subd. (a).) All of the listed circumstances involve "the subcontractor's inability or unwillingness to perform the subcontract." (E.F. Brady, supra, 58 Cal.App.4th at p. 188, 67 Cal.Rptr.2d 886.) The two circumstances *581 relevant here are "[w]hen the listed subcontractor fails or refuses to perform his or her subcontract" (subd. (a)(3)), and "[w]hen the awarding authority, or its duly authorized officer, determines that the ... subcontractor is substantially delaying or disrupting the progress of the work" (subd. (a)(7)). Section 4107 further prohibits the prime contractor from "permit[ting] a subcontract to be voluntarily assigned or transferred or allowing] it to be performed by anyone other than the original subcontractor listed in the original bid, without the consent of the awarding authority, or its duly authorized officer." (§ 4107, subd. (b).)
The procedure for obtaining the public entity's consent requires the awarding authority to provide the subcontractor with written notice of the prime contractor's request for substitution. (§ 4107, subd. (a).) The subcontractor then has five working days within which to file written objections to the request. (Ibid.) If objections are filed, the entity must give the listed subcontractor written notice of a hearing on the request for substitution at least five working days in advance. (Ibid.)
The consequences of an unauthorized substitution can be severe for the prime contractor: the subcontractor may sue the prime contractor (but not the public entity) for damages (Southern Cal, Acoustics, supra, 71 Cal.2d at p. 727, 79 Cal.Rptr. 319, 456 P.2d 975), and the public entity may cancel the prime contractor's contract or assess a penalty not to exceed 10 percent of the amount of the subcontract involved. (§ 4110.) Also, an unauthorized substitution may subject the prime contractor to discipline by the Contractors State License Board. (§ 4111.)

The District's Consent to Kemp's Substitution Request Substantially Complied With Section 4107
Titan contends that section 4107, subdivision (b), prohibited Kemp from replacing Titan before the District consented to the substitution, and that the District had no authority to consent to substitution after another subcontractor had completed the work. Titan asks us to hold that Kemp's substitution was wrongful as a matter of law and that LAUSD's ex post facto consent was unauthorized.[7] We disagree. Although section 4107 contemplates that the awarding authority's consent to substitution and approval of a replacement subcontractor will occur before the replacement performs the subcontract, a deviation from this procedure is valid so long as the procedure used actually complies in substance with the reasonable objectives of the statute. Here, such substantial compliance occurred.
In construing a statute, we seek to effectuate the intent of the Legislature, following certain well-established rules. We first look to the ordinary meaning of the statutory language, which controls if it is without ambiguity or uncertainty. (Lungren v. Deukmejian (1988) 45 Cal.3d 727, 735, 248 Cal.Rptr. 115, 755 P.2d 299.) Such plain meaning, however, is discerned *582 by reading the statute in context, and "[l]iteral construction should not prevail if it is contrary to the legislative intent apparent in the statute. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act." (Ibid.)
We agree with Titan that the plain meaning of the statutory language, construed in context, contemplates that the awarding authority's consent to substituting out a listed subcontractor and substituting in a proposed replacement will occur before the prime contractor permits the replacement to perform any work. That is, section 4107 compels the awarding authority to: (1) give the listed subcontractor written notice of the prime contractor's substitution request; (2) conduct a hearing on the substitution request if the listed subcontractor timely requests; and (3) consent to substitution only if one of the nine listed statutory circumstances exists. Further, unless the awarding authority consents, the prime contractor "may not ... [substitute a person as subcontractor in place of the subcontractor listed in the original bid" (§ 4107, subd. (a)), or "allow [a subcontract] to be performed by anyone other than the original subcontractor listed in the original bid" (§ 4107, subd. (b)).
Kemp argues that there is a distinction under section 4107 between a prime contractor's "substitution" of one subcontractor for another, which requires the awarding authority's prior consent, and a prime contractor's "termination" of a listed subcontractor, which Kemp contends does not. According to Kemp, "[although Titan's termination was a necessary preliminary step before another subcontractor could be substituted in, the plain language of Section 4107 did not prohibit Kemp from terminating Titan without prior approval, nor did it prohibit the [District] from subsequently consenting to that termination on statutorily recognized grounds." Kemp's distinction between "substitution" and "termination" is not one drawn by the statute. Regardless of terminology, if a listed subcontractor is to be replaced by another subcontractor in literal compliance with section 4107, subdivisions (a) and (b), the awarding authority entity will grant the prime contractor's request for substitution (finding a valid statutory ground) and also approve a suggested replacement subcontractor before the prime contractor permits the replacement to perform any work covered by the subcontract. (See E.F. Brady, supra, 58 Cal.App.4th at pp. 190-191, 67 Cal.Rptr.2d 886 [awarding authority must "approve the particular entity that will serve as the substitute subcontractor" and "[a]bsent approval, a second subcontractor may not perform work on the public project"]; Fred J. Early, Jr., Co. v. County Sanitation Dist. (1963) 214 Cal.App.2d 505, 508, 29 Cal.Rptr. 633 ["clear meaning of [§ 4107, subd. (b)] is that the person named in the bid as subcontractor must do the work unless it is given to some one else with the consent of the authority"].) Further, under the plain terms of the statute, the procedure of section 4107 is "obligatory" in the sense that the prime contractor and the awarding authority are required to follow it in order to effect a substitution, as opposed to being merely "directory" in the sense that the awarding authority may choose not to follow it. (See Cal-Air Conditioning, Inc. v. Auburn Union School Dist. (1993) 21 Cal.App.4th 655, 666-667, 26 Cal.Rptr.2d 703 (Cal-Air Conditioning).)
Although Titan is correct in arguing that section 4107 contemplates the holding of the substitution hearing and the issuance of a ruling before a replacement subcontractor performs the subcontract, *583 Titan is incorrect in asserting that the failure to comply with that chronology necessarily invalidates the awarding authority's consent. As the District correctly notes, nothing in the statutory language purports to invalidate an awarding authority's consent to substitution simply because a prime contractor has done what it "may not" do under section 4107, subdivision (b)allow a subcontract to be performed by a replacement subcontractor without the prior consent of the awarding authority. The statute simply does not address this situation. Rather, the failure to literally comply with an obligatory statutory procedure, such as that of section 4107, is valid if the procedure used complies in substance with all reasonable objectives of the statutory scheme. (See Cal-Air Conditioning, supra, 21 Cal.App.4th at pp. 668-669, 26 Cal.Rptr.2d 703 [applying substantial compliance doctrine to prime contractor's failure to give statutorily-required two-day notice under section 4107.5, applicable to request to substitute inadvertently listed subcontractor]; 10 Miller & Starr, Cal. Real Estate (3d ed.2001) § 27:7, p. 32 ["doctrine of substantial compliance applies to the procedures for the substitution of a subcontractor"]).
Kemp argues (in part) that the procedure here complied with the purposes of the statute and should not be invalidated. We agree.
The procedural prerequisites to holding the substitution hearings were met. The District provided timely notice to Titan of Kemp's requests for substitution on the Huntington Park and LACES projects. After receiving Titan's requests for a hearing, the District initially scheduled the hearings for June 2, 2004, but later postponed them at the request of the parties to permit settlement negotiations. After settlement negotiations failed, the District ultimately held the hearings on August 31, 2004, and found two statutory grounds justifying Kemp's substitution requests: Titan failed to perform its subcontract (§ 4107, subd. (a)(3)) and substantially delayed or disrupted the projects (§ 4107, subd. (a)(7)). By then, A & R had completed the subcontract work, though the record does not show precisely when the work was finished. On appeal, Titan does not contend that substantial evidence fails to support the District's findings. Hence, for purposes of our analysis, we take the grounds for substitution found by the District to be established. Thus, while it is true that Titan had the statutory right under section 4107 "to perform the subcontract unless statutory grounds for a valid substitution exist[ed]" (Southern Cal. Acoustics, supra, 71 Cal.2d at p. 727, 79 Cal.Rptr. 319, 456 P.2d 975), that right was not violated.
The sole procedural irregularity in the granting of the substitution request was the District's holding of the hearings and granting consent to substitution after Kemp had permitted A & R to complete the subcontract work. But under the facts here, this procedure did not violate the purposes of the statute. "`Substantial compliance, as the phrase is used in the decisions, means actual compliance in respect to the substance essential to every reasonable objective of the statute.' [Citation.] Where there is compliance as to all matters of substance[,] technical deviations are not to be given the stature of noncompliance. [Citation.] Substance prevails over form. When the plaintiff embarks [on a course of substantial compliance], every reasonable objective of [the statute at issue] has been satisfied." (Southern Pac. Transportation Co. v. State Bd. of Equalization (1985) 175 Cal.App.3d 438, 442, 221 Cal.Rptr. 12; see Cal-Air Conditioning, supra, 21 Cal.App.4th at p. 668, 26 Cal.Rptr.2d 703.) As here relevant, *584 the objectives of section 4107 are to prevent bid shopping and bid peddling and to give the awarding authority the opportunity to investigate and approve proposed replacement subcontractors. (§ 4101; see Southern Cal. Acoustics, supra, 71 Cal.2d at pp. 725-726, 79 Cal.Rptr. 319, 456 P.2d 975; E.F. Brady, supra, 58 Cal.App.4th at p. 189, 67 Cal.Rptr.2d 886.)
The administrative record demonstrates that no bid shopping by Kemp or bid peddling by A & R occurred. Kemp replaced Titan with A & R because, as the District found, Titan abandoned the projects. Indeed, Kemp's evidence at the hearing established that Kemp initially contacted A & R only after being informed by Titan's vice-president, Don Quillao, that Titan was winding down its business and would not return. Further, Kemp initially contacted A & R simply to use it as a conduit for distribution of the payroll advance to Titan's employees. Thus, the statutory goal of preventing bid shopping and bid peddling was preserved.
The statutory purpose of giving the District the opportunity to investigate A & R so as to ensure the quality of the work was also met. Kemp's requests for substitution named A & R as the proposed replacement subcontractor, and listed A & R's address and contractor's license number. Hence, the District had the opportunity to investigate A & R before consenting to substitution. The evidence in the administrative record showed that Kemp had previously worked with A & R several times over the prior 10 to 15 years, and knew A & R to be reputable. Nothing in the record suggests that the District thought otherwise, or that it found A & R's work to be substandard. Although the District did not formally approve A & R as Titan's replacement, the granting of Kemp's substitution request constituted implicit approval of A & R.
Titan asserts that the postponements of the hearings from June 2 to August 31, 2004, occurred solely at Kemp's request, and suggests that the delay was sought to permit A & R to complete the subcontract work. The administrative record, however, shows that in requesting the postponements Kemp spoke for both parties. (See fn. 3, ante.) Further, there is no evidence that Titan ever objected that postponement of the hearings would prejudice Titan by permitting A & R to complete the projects before a ruling on the substitution requests could be obtained.
Titan contends that permitting the administrative hearing to be held after the replacement subcontractor has performed the subcontract allows the prime contractor to create artificial grounds for substitution. According to Titan, a prime contractor could prevent the listed subcontractor from performing by hiring a replacement contractor. Then the prime contractor could seek substitution under section 4107, subdivision (a)(3), on the ground that the listed subcontractor failed or refused to perform. The prime contractor could thus "circumvent the statute by creating the very condition that is grounds for substitution. That is precisely what happened in this case." Further, according to Titan, because the subcontract would have already been completed, the listed subcontractor would have little incentive to seek a hearing and the awarding authority would have little incentive to invalidate the substitution.
Titan's argument posits a result that cannot occur under section 4107 and did not occur here. In Titan's hypothetical, the listed subcontractor is able and willing to perform. However, all of the statutory circumstances justifying substitution under section 4107 involve a subcontractor who is unable or unwilling to perform. (E.F. Brady, supra, 58 Cal.App.4th at p. 188, 67 *585 Cal.Rptr.2d 886.) Were a prime contractor to prevent an able and willing subcontractor from completing the subcontract as posited by Titan, the subcontractor could not be deemed to have failed or refused to perform within the meaning of section 4107, subdivision (a)(3). Moreover, Titan incorrectly asserts that its posited hypothetical was actually implemented by Kemp. As we have already noted, the District concluded that Titan abandoned the projects, and that valid grounds for substitution existed under section 4107, subdivisions (a)(3) and (a)(7). Titan does not challenge the sufficiency of the evidence to support the District's findings, and for purposes of appeal those findings are established.
Titan's assertion that a wrongfully-replaced subcontractor would have little incentive to seek a hearing once a replacement has completed the work is incorrect. A subcontractor who is replaced in violation of section 4107 has a cause of action for damages against the prime contractor. A necessary prerequisite to such a claim is the exhaustion of administrative remedies, including demanding a hearing on the substitution. (See Affholder, Inc. v. Mitchell Engineering, Inc. (2007) 153 Cal.App.4th 510, 519-520, 63 Cal.Rptr.3d 121; Interior Systems, Inc. v. Del E. Webb Corp. (1981) 121 Cal.App.3d 312, 318-319, 175 Cal.Rptr. 301.) Thus, a wrongfully-replaced subcontractor has every incentive to demand a substitution hearing in order to pursue its remedy of damages.
Titan is also incorrect in asserting that the awarding authority would have little incentive to find the substitution wrongful. Under section 4110, "[a] prime contractor violating any of the provisions of this chapter violates his or her contract and the awarding authority may exercise the option, in its own discretion, of (1) canceling his or her contract or (2) assessing the prime contractor a penalty in an amount of not more than 10 percent of the amount of the subcontract involved."[8] The availability of these penalties gives the awarding authority strong incentive to invalidate a wrongful substitution if, in fact, a wrongful substitution has occurred. Without such a determination, the awarding authority would be unable to impose an appropriate sanction (if any) including a sanction that would lessen the authority's cost of construction by up to 10 percent of the subcontract involved.
We conclude that although the timing of the substitution hearing was not in literal compliance with the chronology contemplated by section 4107, the procedure used complied in substance with every reasonable objective of the statute. (Cal-Air Conditioning, supra, 21 Cal.App.4th at p. 671, 26 Cal.Rptr.2d 703.) Therefore, the District's consent to Kemp's request to substitute Titan out of the Huntington Park and LACES projects was valid.

DISPOSITION
The order of the superior court is affirmed. Kemp and the District shall recover their costs on appeal.
We concur: MANELLA, and SUZUKAWA, JJ.
NOTES
[1] All undesignated section references are to the Public Contract Code.
[2] The District's administrative hearing on the substitution request for the LACES project was held first, followed by the hearing on the Huntington Park project. Both hearings covered largely the same issues, and the parties agreed that the evidence from the LACES hearing would be incorporated by reference into the Huntington Park hearing. In summarizing the administrative record, we do not distinguish between the two hearings, and discuss the record as a unitary whole. On appeal, the parties have taken the same approach.

In the trial court, Titan contended that the District's decisions affected a fundamental vested right, and that therefore the trial court was required to review the District's findings under the independent judgment test. (See Bixby v. Pierno (1971) 4 Cal.3d 130, 143, 93 Cal.Rptr. 234, 481 P.2d 242 (Bixby).) The trial court determined, however, that no fundamental right was involved, and that the standard of review was simply whether the administrative decision was supported by substantial evidence in the administrative record. (See Bixby, supra, 4 Cal.3d at p. 144, 93 Cal.Rptr. 234, 481 P.2d 242.) On appeal, Titan does not challenge the trial court's application of the substantial evidence test, and does not contend that the District's findings were not supported by substantial evidence. Titan has therefore forfeited any claim that the trial court erred in its standard of review or that the District's findings lack evidentiary support. We summarize the administrative record in accord with the proper standard on appeal, presuming the District's factual findings to be correct and drawing all reasonable inferences in support of those findings. (See MHC Operating Limited Partnership v. City of San Jose (2003) 106 Cal.App.4th 204, 218-219, 130 Cal.Rptr.2d 564 (MHC); Ryan v. California Interscholastic Federation-San Diego Section (2001) 94 Cal.App.4th 1048, 1077-1078, fn. 21, 114 Cal.Rptr.2d 798.) Of course, on issues of law, such as the interpretation of section 4107, our review is de novo. (MHC, supra, 106 Cal.App.4th at p. 219, 130 Cal.Rptr.2d 564.)
[3] The District's hearing officer stated in his amended rulings that the "hearing was rescheduled five times ... at the request of Kemp in its attempts to resolve the matter with Titan." In its opening brief on appeal, Titan extrapolates from this finding the assertion that "[a]t Kemp's request, the hearings were rescheduled five times so that they were not held until August 31, 2004, after both subcontracts had been fully performed by A & R." Titan thus suggests that Kemp alone was responsible for the postponement of the hearings, and that Kemp sought the delay in order to permit A & R to complete work under the subcontracts. However, those suppositions do not flow from the hearing officer's ruling and are unsupported by the administrative record. As the hearing officer concluded, Kemp made the requests for postponement. However, it did so with Titan's full knowledge and consent.

On May 28, 2004, Kemp faxed a letter to the District stating that Kemp "[had] spoken with Titan Electric Corporation's counsel who has agreed to postpone both hearings for approximately two weeks while Kemp and Titan attempt to resolve the matters surrounding Kemp's requests for substitution. [H] Upon confirmation of the above with Titan's counsel, please schedule new hearing dates for approximately June 16, 2004." The District rescheduled the hearings for June 17, 2004.
On June 15, 2004, Kemp faxed the District a letter stating that Kemp and Titan had reached an impasse, and requesting a hearing date at the end of June or beginning of July, which would permit sufficient time to prepare. After the hearings were rescheduled for July 8, 2004, they were again postponed with Kemp and Titan's joint consenta fact confirmed in a letter Titan faxed to the District on July 28, 2004, reporting that further negotiations had broken down. Titan's July 28 letter stated that "[t]he July 8th, 2004 substitution hearing was taken off calendar pending a resolution through negotiations between Titan Electric and Kemp Bros. Construction, Inc. Those negotiations have since broken down, and as a result Titan is requesting the hearing to be put back on calendar." In a letter faxed on July 21, Kemp had already informed the District of the failure of the additional negotiations and requested a hearing date of August 9 or 12. The District ultimately set the hearings for August 31, 2004.
Thus, to the extent Titan asserts on appeal that Kemp alone delayed the administrative hearings in order to complete the subcontract work before the hearings, the assertion is contrary to the administrative record. Moreover, we note that Titan cites nothing in the record to indicate that it objected to the postponements.
[4] In its opening brief on appeal, Titan discusses the August 5, 2005 rehearing request in detail, and quotes from Quillao's declaration. However, Titan does not challenge the trial court's ruling limiting its review to the evidence introduced at the administrative hearings, or the trial court's ruling that the District did not abuse its discretion in denying rehearing. Titan has therefore forfeited any challenge to those rulings, and we do not consider the evidence in our decision.
[5] We have received two applications to file amicus briefs: one from the Associated General Contractors of California in support of Kemp; the other from the American Subcontractors Association in support of Titan. We grant the applications. However, because the arguments raised largely mirror the arguments of the parties, we do not specifically mention the amicus briefs in our opinion.
[6] "Bid shopping is the use of the low bid already received by the general contractor to pressure other subcontractors into submitting even lower bids. Bid peddling ... is an attempt by a subcontractor to undercut known bids already submitted to the general contractor in order to procure the job." (Southern Cal. Acoustics Co. v. C.V. Holder, Inc. (1969) 71 Cal.2d 719, 726, fn. 7, 79 Cal.Rptr. 319, 456 P.2d 975 (Southern Cal. Acoustics); E.F. Brady Co. v. M.H. Golden Co. (1997) 58 Cal. App.4th 182, 189-190, 67 Cal.Rptr.2d 886 (E.F.Brady).)
[7] The District and Kemp contend that by participating in the administrative hearings without disputing the District's authority to conduct them, Titan forfeited any challenge to the District's power to consent to substitution. (See Morris v. Unemployment Ins. Appeals Bd. (1973) 34 Cal.App.3d 1002, 1008, 110 Cal. Rptr. 630 [failure to raise alleged error in administrative hearing generally precludes review of alleged error on appeal].) However, in the hearings Titan contended, in substance, that Kemp failed to follow the procedure of section 4107 in replacing Titan, and that it would be inconsistent with the statute for the District to consent to substitution after Titan was replaced. Titan's contention is adequate to preserve its statutory construction argument on appeal.
[8] To impose either of these penalties, the awarding authority must hold a hearing with five days notice to the prime contractor.