Filed 12/17/18; Certified for Publication 1/3/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| JMS AIR CONDITIONING AND APPLIANCE SERVICE, INC., | B284068 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BS163309) |
| v. | |
| SANTA MONICA COMMUNITY COLLEGE DISTRICT et al., | |
| Defendants and Respondents; | |
| BERNARDS BROS., INC., | |
| Real Party in Interest and Respondent. | |

Appeal from a judgment of the Superior Court of Los Angeles County, Amy D. Hogue, Judge. Affirmed.

Pitre & Teunisse and Randall J. Pitre for Plaintiff and Appellant JMS Air Conditioning and Appliance, Inc.

Carpenter, Rothans & Dumont, Justin Reade Sarno, and Louis R. Dumont for Defendants and Respondents Santa Monica Community College District and Greg Brown.

Pepper Hamilton, Ted R. Gropman, and Luke N. Eaton for Real Party in Interest and Respondent Bernards Bros., Inc.

Plaintiff and appellant JMS Air Conditioning and Appliance, Inc. (JMS) appeals from the superior court's June 5, 2017 denial of JMS's petition for writ of administrative mandate. That petition asked the superior court to set aside an administrative decision by defendant and respondent Santa Monica Community College District (the District) that allowed a contractor with the District, real party in interest and respondent Bernards Bros., Inc., to substitute another subcontractor in the place of JMS on a construction project for the District. The court denied JMS's petition, and for the reasons discussed below, we affirm the court's denial.

## FACTUAL AND PROCEDURAL BACKGROUND

JMS challenges a decision the District issued pursuant to procedures in the Subletting and Subcontracting Fair Practices Act (the Act) (Pub. Contract Code, § 4100 et seq.).[1]

The Act stems from legislative concerns about the practices of "bid shopping" and "bid peddling" on public works projects. "Bid shopping" is "the use of the low bid already received by [a] general contractor to pressure other subcontractors into submitting even lower bids." (*Southern Cal. Acoustics Co. v. C. V. Holder, Inc.* (1969) 71 Cal.2d 719, 726, fn. 7 (*Southern Cal. Acoustics*).) A subcontractor engages in "bid peddling" when it attempts to "undercut known [subcontract] bids already submitted to the general contractor in order to procure the job." (*Ibid.*) The Legislature found that these practices result in "poor quality of material and workmanship to the detriment of the public, deprive the public of the full benefits of fair competition

---

[1] Unless otherwise specified, all statutory references are to the Public Contract Code.

2

among prime contractors and subcontractors, and lead to insolvencies, loss of wages to employees, and other evils." (§ 4101.)

The Act seeks to prevent these evils by "provid[ing] an opportunity to the awarding authority to investigate and approve the initial subcontractors and any proposed substitutions." (*Southern Cal. Acoustics*, *supra*, 71 Cal.2d at pp. 725–726.) It requires that a general contractor specifically list in a bid for public work the subcontractors it intends to use for the project. (§ 4104.) Once the awarding authority accepts a bid, the Act permits the general contractor to substitute out a listed subcontractor *only* on certain enumerated bases, all but one of which relate to the subcontractor's ability or willingness to perform the work, or to perform it appropriately.[2] (§ 4107, subd. (a).) The general contractor must receive approval from the awarding authority for any such substitution, and the Act establishes procedures for such requests. (*Ibid.*) These procedures require that a subcontractor receive written notice of a substitution request and, if the subcontractor timely objects, "the awarding authority" must hold a hearing to decide if it will allow the substitution. (*Ibid.*)

---

[2] Specifically, section 4107, subdivisions (a)(1)–(a)(4), (a)(6) & (a)(7) provide the following bases for substitution: (a) subcontractor refuses to execute subcontract; (b) subcontractor becomes bankrupt or insolvent; (c) subcontractor fails or refuses to perform; (d) subcontractor fails or refuses to meet bond requirements; (e) subcontractor is not licensed; and (f) awarding authority determines subcontractor's work is substantially unsatisfactory or not in substantial accordance with the specifications, or is substantially delaying or disrupting the progress of the work.

## A.    *JMS's Work for the District*

The District contracted with the general contractor Bernards Bros., Inc. (Bernards) to construct a new facility.  In Bernards's bid to the District for this work, it listed JMS as the subcontractor to install the heating, ventilation, and air conditioning system at the facility, per division 23 of the project specifications (the HVAC Specification).  JMS holds a C-20 California contractor's license to perform "warm-air heating, ventilating and air-conditioning" work.  (Capitalization omitted.)  Bernards and JMS entered into a subcontractor agreement in November 2014, and JMS commenced work in April 2015.  The scheduled payment for all work JMS was to perform under the subcontract is approximately $8.2 million.

## B.    *Bernards's Substitution Request and the Substitution Hearing*

On March 30, 2016, Bernards requested in writing that the District permit it to "substitute another [s]ubcontractor for JMS" because JMS had "failed or refused to perform its subcontract obligations and may not be properly licensed for a portion of its work pursuant to the [c]ontractors [l]icense [l]aw."  Bernards cited section 4107 subdivisions (a)(3) and (a)(6) as the statutory bases for its request, but provided no further detail.  (*Ibid.*)  The District forwarded a copy of the request to JMS that same day.  In an April 5, 2016 letter to the District, JMS objected to Bernards's request.  This objection triggered JMS's right to a section 4107 substitution hearing. (See § 4107.)

On April 12, 2016, the District proposed a hearing date of April 18, identified the "[h]earing [o]fficer" as Greg Brown, and set forth time limitations for the hearing.  Brown is the facilities manager

for Santa Monica Community College and thus "generally knowledgeable about the [p]roject."

JMS objected to the April 18 date and the proposed time restrictions, and requested the District reschedule the hearing to no earlier than May 2. The District ultimately rescheduled the hearing for May 6, 2016. Brown informed the parties in advance that the hearing would be limited to two hours and that neither "[t]echnical rules of evidence" nor a right to cross-examine witnesses would apply.

At Brown's invitation, JMS and Bernards each submitted written statements detailing their positions. Brown set no page limits on these statements, nor did he restrict the number of exhibits or written witness statements the parties could submit. In JMS's April 25, 2016 "Statement of Position," JMS denied that it had refused to perform any work. As to Bernards's claim that JMS lacked the proper license to do "a portion of" work, JMS assumed that the claim related to the hydronic plumbing work listed in the HVAC Specification. JMS contended that this claim lacked merit because JMS's C-20 HVAC license covered such plumbing work as "incidental and supplemental" or "essential" to HVAC work. JMS relied on Business and Professions Code section 7059, permitting specialty contractors to perform work that is "incidental and supplemental to the performance of the work in the craft for which the specialty contractor is licensed," (Bus. & Prof. Code, § 7059, subd. (a)), as well as a California State Licensing Board (CSLB) regulation that defines "incidental and supplemental" as "essential to accomplish the work in which the contractor is classified." (Cal. Code Regs., tit. 16, § 831.)

Bernards submitted a May 3, 2016 "Statement of Position," which JMS counsel purports to have received on May 4, 2016, that describes the factual basis for Bernards's substitution request. In it, Bernards identified two types of work it contended JMS

5

was not licensed to perform:  The hydronic boiler work and the hydronic plumbing work listed in the HVAC Specification.  The statement attaches a 250-page "Exhibit Book," which contains, among other materials, documents detailing 21 "Performance Deficienc[ies]," and a written statement of Robert B. Berrigan, a lawyer and former licensing deputy for CSLB.

In this unsworn statement, Berrigan stated that, while working at CSLB, he "reviewed the plans and specifications for all public work projects performed by" several public agencies "to determine the proper classification of contractor to perform the work involved." He described his role there as "the ultimate administrative authority in [s]tate [g]overnment for determining whether a contractor's license was required for any project or type of work," and noted he often gave "expert testimony" in administrative hearings and civil litigation on this topic.

Berrigan opined that JMS is not licensed to perform the boiler work listed in the HVAC Specification.  He concluded that boiler work is not "incidental and supplemental" or "essential" to HVAC work.  On this basis, he further concluded that such boiler work is not covered by JMS's C-20 HVAC contractor license and would instead require a C-4 boiler license.  Berrigan noted that he "ha[d] not formed an opinion" on whether JMS required a separate C-36 plumbing license to perform the hydronic plumbing work JMS had performed to date.

On May 6, 2016, Brown conducted the substitution hearing assisted by campus counsel, who "serv[ed] as [a] legal advisor to [Brown]."  At the hearing, Brown accepted the written materials from both sides and afforded each side 40 minutes to present its case, as well as a 10-minute right of reply and brief closing arguments. Bernards offered two of its employees as witnesses:  Michael Toepfer, a senior project manager, and Dave Iman, a superintendent.  None of

6

the witnesses who spoke at the hearing did so under oath, nor did either party object to this. Both Toepfer's and Iman's statements focused on complaints about the quality and timeliness of JMS's work. Toepfer, however, stated that JMS had not delayed the overall "critical path" of the project. Neither of Bernards's witnesses disputed JMS's contention that JMS had completed all work under the contract.

At the hearing, JMS provided Brown with written responses to the alleged performance deficiencies detailed in Bernards's Exhibit Book. JMS president, Joe Messica, was JMS's sole witness at the hearing. Messica is the "qualifier on JMS's [C-20 contractor] license," meaning he possesses "the degree of knowledge and experience in the [C-20 HVAC] classification . . . and the general knowledge of the building, safety, health, and lien laws of the state and of the administrative principles of the contracting business that [CSLB] deems necessary for the safety and protection of the public." (See Bus. & Prof. Code, § 7068, subd. (a).) Messica stated that he had completed HVAC installations similar to the project, including "a $9.2 million project with UCLA Weyburn." Messica further stated that he viewed the boiler work set forth in the HVAC Specification and the piping work JMS had done to date on the project as "essential to the HVAC system . . . installed by JMS." JMS counsel reiterated its arguments that the boiler and plumbing work were "essential" to HVAC work, and that, therefore, both were covered by JMS's license.

C.    *The Substitution Decision*

On May 10, 2016, Brown sent a letter to the parties (the Substitution Decision), approving Bernards's substitution request under section 4107, subdivision (a)(3) (failure to perform) and subdivision (a)(6) (lack of license). In the Substitution Decision, Brown declined to consider the argument Bernards raised in its

7

statement of position that section 4107, subdivision (a)(7) (regarding unsatisfactory work) provides an additional basis for substitution, as Bernards did not list this basis in its initial substitution request. Brown did, however, consider the purported deficiencies in JMS's work as relevant to other bases for substitution. Specifically, Brown concluded that JMS had "failed to perform" under the subcontract in that JMS had not performed its work "in the most sound, workmanlike, and substantial manner," which the subcontract required.

Brown also found JMS was not licensed to perform "the work" under the subcontract, and that this provided another basis for substitution. He relied heavily on Berrigan's statement for this conclusion, describing Berrigan as a "qualified expert in licensing" and noting that JMS "offered no expert testimony to rebut . . . Berrigan." Brown described the Berrigan statement as "expressly reject[ing]" that either the C-4 boiler work or the C-36 plumbing work was "incidental and supplemental" to work covered by JMS's C-20 HVAC license. Finally, Brown noted in the Substitution Decision that JMS had performed over $3 million worth of boiler and piping work, and that such a substantial amount of work could not be "incidental and supplemental."

### D.    JMS's Petition and Appeal

JMS filed a timely petition for writ of administrative mandamus. At the hearing on the writ, JMS argued that Brown lacked jurisdiction to hold the substitution hearing, that JMS was denied due process, and that the evidence presented at the hearing did not support the Substitution Decision. The court rejected JMS's jurisdictional and due process arguments. The court found substantial evidence supported substitution based on improper licensure, but found that there was no substantial evidence to support

8

substitution based on a "[f]ailure or [r]efusal to [p]erform." (Italics and underlining omitted.) The court denied JMS's petition and JMS timely appealed.

## DISCUSSION

### I. Brown Had Jurisdiction to Approve Bernards's Request for Substitution under Section 4107

JMS contends that Brown lacked jurisdiction to hear the substitution request because section 4107 authorizes only the District—and not any delegate thereof—to conduct a contested substitution hearing.

The District argues that this is a non-jurisdictional argument that JMS forfeited when JMS failed to raise the issue below. We disagree. Basically, JMS's argument is that the entity making a decision affecting a statutory right and affording specific relief lacked authority to do so. This is the definition of a jurisdictional issue. (See Black's Law Dict. (10th ed. 2014) p. 980, col. 1 [defining "jurisdiction" as "[a] court's power to decide a case or issue a decree"]; *id.*, at p. 983, col. 2 [defining "subject-matter jurisdiction" as "[j]urisdiction over the nature of the case and the type of relief sought; the extent to which a court can rule on the conduct of persons or the status of things"].) And a litigant cannot correct a jurisdictional deficiency by failing to object. (*Harrington v. Superior Court* (1924) 194 Cal. 185, 188; *People v. Ainsworth* (1990) 217 Cal.App.3d 247, 255.) We will therefore review the court's decision that Brown had jurisdiction to hold the substitution hearing. Our review is de novo, as this issue presents a pure question of law. (*Nasha v. City of Los Angeles* (2004) 125 Cal.App.4th 470, 482.)

JMS argues that the literal language of section 4107 supports its jurisdictional argument, and that any other reading would make section 4114 superfluous. We disagree.

9

JMS points out that virtually every time section 4107 references "the 'awarding authority,' " it includes the qualifying language "or its duly authorized officer." The only time the statute does not use this full phrase ("the awarding authority, or its duly authorized officer") is when section 4107 identifies the entity to hold substitution hearings as simply "the awarding authority." According to JMS, this shows the Legislature intentionally omitted the "duly authorized officer" qualifier to assure the awarding authority *itself* will conduct substitution hearings.

But the "plain meaning [of a statute] is discerned by reading the statute *in context*." (*Titan Electric Corp. v. Los Angeles Unified School Dist.* (2008) 160 Cal.App.4th 188, 203, italics added.) Thus, "[l]iteral construction should not prevail if it is contrary to the legislative intent apparent in the statute." (*Lungreen v. Deukmejian* (1988) 45 Cal.3d 727, 735 (*Lungreen*).) Courts also consider the purpose of a statute in determining whether the Legislature intended to omit certain language. For example, in *Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1118, the court considered the history of statutory amendments in concluding the Legislature had intentionally omitted language from a statute. And in *Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564, the court looked to the "competing interests underlying the Act" as "lend[ing] further support for" its decision not to imply use of a phrase the statute uses elsewhere. (*Id.* at p. 577.) Thus, although JMS is correct that courts generally should not insert words into a statute after the Legislature has chosen to omit them, that maxim does not permit this court to ignore the broader goals of the statute—particularly where the Legislature has codified those goals. (See § 4101.)

Nothing in the record, nor the Act's history, nor its overall structure suggests that preventing an awarding authority's agent from conducting a substitution hearing might help combat bid shopping or bid peddling. Moreover, JMS reads section 4107 as micro-managing which individuals the awarding authority may designate to act on its behalf. Such an interpretation is at odds with the Act's goal of *more* control for the awarding authority in selecting subcontractors. Our interpretation is also consistent with section 4107 subdivision (a), which requires "the awarding authority *or its duly authorized agent*" to consent to or reject the substitution. (Italics added.) Finally, our interpretation most efficiently services the statute's goals. The District is an educational institution, and the primary purpose of its governing board is thus to educate—not to referee construction disputes. (See *Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1078 [" 'A university's primary purpose is to educate students: "[a] school is an academic institution, not a courtroom or administrative hearing room." ' "].) Moreover, members of the District's governing board do not necessarily have any background in construction; indeed, such background would be only fortuitous. Thus, requiring the District's governing board—as opposed to a duly authorized delegate thereof with background and job responsibilities related to construction—to adjudicate a construction dispute would be an inefficient allocation of public resources.

JMS also urges that its literal interpretation of section 4107 is necessary to avoid rendering another section in the Act, section 4114, superfluous. Section 4114 expressly authorizes a county board of supervisors to "delegate its functions" as an awarding authority under section 4107 "to any officer designated by the board." (§ 4114.) According to JMS, section 4114 would serve no purpose and make no sense if section 4107 already permits any awarding authority to

11

delegate its section 4107 responsibilities. We agree that the interplay between these statutes renders the language of section 4107 less clear. What *is* clear, however, is the Legislature's stated purpose in drafting the Act. And if it is possible to read the "letter" of both section 4107 and section 4114 in a way that "conform[s] to the spirit of the act," we must do so. (*Lungreen, supra*, 45 Cal.3d at p. 735.) We conclude this is possible by adopting our interpretation of section 4107. As discussed above, delegating the burden of conducting a section 4107 hearing to an employee with relevant job responsibilities or other qualifications is highly efficient. This is particularly true for an awarding authority, such as a board of supervisors, shouldering a broad range of responsibilities. It makes sense, therefore, that the Legislature chose to reiterate, via section 4114, an awarding authority's ability to delegate section 4107 responsibilities in situations where the authority is a board of supervisors. Our interpretation of section 4107 thus "conform[s] to the spirit" of the Act: encouraging awarding authority involvement in subcontracting decisions—in a manageable and practical way—with the larger goal of preventing bid shopping and bid peddling.

We therefore reject JMS's interpretation of section 4107 and conclude that Brown had jurisdiction to conduct JMS's substitution hearing under section 4107.

## II. Neither the Substitution Hearing, Nor the Substitution Decision Affected a Fundamental Vested Right

JMS's remaining arguments on appeal challenge (i) the due process afforded him at the substitution hearing, and (ii) the sufficiency of the evidence supporting the Substitution Decision. Crucial to our analysis of both arguments are the nature and scope of the rights at issue at substitution hearings and in the substitution decisions resulting therefrom. First, which subcontractor rights

12

section 4107 affects informs the level of due process a substitution hearing must afford a subcontractor like JMS. (See *Hannah v. Larche* (1960) 363 U.S. 420, 442 (*Hannah*).) Second, whether Brown's Substitution Decision substantially affects a fundamental vested right dictates the standard of review we must apply to JMS's arguments regarding the sufficiency of the evidence. (*Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32 (*Strumsky*); *Bixby v. Pierno* (1971) 4 Cal.3d 130, 144 (*Bixby*).) Because the nature and scope of the rights implicated are threshold issues, we discuss them before directly addressing JMS's due process and evidentiary arguments.

## A. *The Act Affords Subcontractors Only Limited, Ancillary Rights*

The Act's express and singular purpose is to prevent bid shopping and bid peddling. (See Discussion *ante*, part I.) As a byproduct of the Act's efforts to accomplish this, subcontractors listed in a public bid enjoy limited statutory rights: The right to "perform the subcontract unless statutory grounds for a valid substitution exist" and the right to a section 4107 hearing, if the subcontractor timely objects to a substitution request. (See *Southern Cal. Acoustics*, *supra*, 71 Cal.2d at p. 727; see § 4107 [requiring hearing for properly contested substitution request]; see also *Affholder, Inc. v. Mitchell Engineering, Inc.* (2007) 153 Cal.App.4th 510, 517-518.) These rights are ancillary to the Act's larger objectives; the Act did not set out to create and does not focus on rights for subcontractors. (See, e.g., *id.* at p. 518.) Indeed, the Act protects subcontractors only to the extent that *preventing bid peddling and bid shopping* might protect them. (See *Southern Cal. Acoustics, supra,* 71 Cal.2d at p. 726 [Act's goal is "to protect the public and subcontractors from the evils . . . of bid shopping and bid peddling subsequent to the award of the prime

13

contract for a public [project]"].) The Act's history confirms this. (See Discussion *ante*, part I.)

### B. *A Substitution Decision Affects Only a Subcontractor's Limited Ancillary Rights Under the Act*

A substitution hearing affects only the statutory rights of a subcontractor under section 4107. This is because substitution hearings are entirely creatures of the Act—without section 4107, no administrative action could second-guess a general contractor seeking to replace one of its subcontractors. The corollary to this is that a section 4107 substitution hearing does not adjudicate anything beyond those limited rights section 4107 created.

Thus, a subcontractor like JMS remains free to pursue claims against the prime contractor that are not based on section 4107 statutory rights or duties. For example, if JMS believes it was wrongfully terminated under the terms of the subcontract with Bernards, it may seek redress under the terms of that contract. Indeed, JMS has sought such redress.[3] Likewise, JMS's defenses

---

[3] On April 5, 2018, we granted JMS's unopposed request for judicial notice on appeal, which attached a complaint JMS filed against Bernards on December 1, 2017, titled "complaint for damages for breach of contract; common counts; for recovery on payment bond." (Capitalization omitted.) In it, JMS alleges Bernards breached the subcontract regarding the project "wrongfully and without legal justification" when Bernards "removed JMS from the [p]roject." The complaint notes that JMS is suing primarily to stay the statute of limitations on these claims, as the subcontract provides for arbitration of disputes.

against the indemnification claims JMS's surety has filed,[4] or in any future CSLB licensing proceeding, remains unaffected in the wake of the Substitution Decision.

Moreover, as JMS points out in its own brief, the findings in the Substitution Decision do not "possess a judicial character" and thus have no binding effect in non-section 4017 civil or administrative actions.  (See, e.g., *Y.K.A. Industries, Inc. v. Redevelopment Agency of City of San Jose* (2009) 174 Cal.App.4th 339, 357 [" 'For an administrative decision to have collateral estoppel effect, it and its prior proceedings must possess a judicial character . . . includ[ing] . . . testimony given under oath or affirmation [and] a party's ability to subpoena, call, examine, and cross-examine witnesses.' "].)  For example, the Substitution Decision does not prevent the trier of fact in any such case from determining that JMS did not need any additional licenses in order to perform the boiler and plumbing work, or from

---

[4] Exhibit 13 to JMS's request for judicial notice (see fn. 3, *ante*) contains a verified complaint of JMS's surety, Berkley Insurance Company, against JMS and its principals.  The complaint seeks indemnification under an agreement between JMS and Berkley, executed as a condition of the bond Berkley issued regarding JMS's work on the project.  The complaint alleges Bernards has sought to collect from Berkley based on JMS being in "default" following its termination from the project.  Specifically, the complaint attaches correspondence from Bernards to Berkley informing the former of JMS's termination from the project, that Bernards will be engaging the services of another subcontractor to complete the project, and that Bernards will seek from Berkley any costs associated with this work that exceed the price under the subcontract with JMS.

reaching a conclusion regarding whether JMS performed its work to the required standard.[5]

In short, the Substitution Decision affects only JMS's rights under section 4107. All of JMS's other rights and remedies remain unaffected.

## C. *The Substitution Decision Does Not Affect "Fundamental, Vested Rights"*

Courts determine on a case-by-case basis whether a right is "vested" and "fundamental," taking into account both economic effects and effects "in human terms and the importance of [the right] to the individual in the life situation." (*Bixby, supra,* 4 Cal.3d at p. 144.) Courts have rarely viewed purely economic interests, such as the right to profit under a particular business venture, as a fundamental vested right. (See, e.g.*, Kawasaki Motors Corp. v. Superior Court* (2000) 85 Cal.App.4th 200, 204 (*Kawasaki Motors Corp.*) [privilege

---

[5] *Interior Systems, Inc. v. Del E. Webb Corp.* (1981) 121 Cal.App.3d 312, does not require a different collateral estoppel analysis. In that case, after receiving a prime contractor's request to substitute one of its subcontractors, an awarding authority conducted a section 4107 substitution hearing and concluded statutory grounds existed for the substitution. (*Id.* at pp. 314-315.) The subcontractor did not pursue administrative review of the Substitution Decision, and instead sued the prime contractor for damages, alleging the prime contractor had violated its "statutory duty" under section 4107. (*Id.* at pp. 314-315, 319.) The court held that the subcontractor could only challenge the Substitution Decision by writ of mandate. (*Id.* at p. 320; see *id.* at pp. 318-319.) Applying this same logic here, because we affirm the Substitution Decision, JMS is precluded from suing for violation of section 4107. But this preclusion does not apply to any other actions or defenses.

16

to operate a Kawasaki dealership is not a fundamental right].)
The Substitution Decision terminates JMS's right to work on
one particular project, nothing more.  Thus, although it may
cause JMS to lose money, it affects a purely economic right that is
not fundamental.  (See *Champion Motorcycles, Inc. v. New Motor
Vehicle Bd.* (1988) 200 Cal.App.3d 819, 825 [rejecting argument that
"enormous" financial losses affected fundamental rights].)  Purely
financial effects will only affect "fundamental" rights in extreme,
unique situations, such as when an administrative decision imposes
"operating conditions [that] severely impair their ability to function
or . . . drive [the company] out of business."  (See *Benetatos v. City
of Los Angeles* (2015) 235 Cal.App.4th 1270, 1281-1282.)  The
Substitution Decision does no such thing.   It imposes no restrictions
on JMS's ability to function.   And, as we have discussed, to the extent
JMS argues other proceedings, such as the indemnification suit,
threaten to put the company out of business, the decisions in those
separate proceedings—proceedings in which the the Substitution
Decision findings can have no collateral estoppel effect—would be the
cause, not the Substitution Decision.

Bearing in mind the limited scope and non-fundamental nature
of the rights the substitution hearing and Substitution Decision affect,
we consider JMS's due process and evidentiary arguments.

## III.  The Hearing Afforded JMS the Due Process Required for a Substitution Hearing

JMS contends that several aspects of the substitution hearing
denied it due process.  These arguments present primarily legal
issues and involve mainly undisputed facts.  Therefore, we will
"exercise our own judgment" regarding "whether appellant received
a fair administrative trial."  (*Vollstedt v. City of Stockton* (1990)

17

220 Cal.App.3d 265, 273.)  Exercising such judgment, we conclude that JMS received the due process required for a substitution hearing.

JMS does not dispute that it presented its case to a neutral decision maker; it had an unlimited opportunity to present documents, written witness statements and argument; it had the opportunity to present in-person witnesses and oral argument at the hearing.  Moreover, JMS availed itself of these opportunities.  And although JMS disputes whether the notice JMS received was timely (see Discussion *post*, part III.C), JMS received a detailed description of Bernards's complaints in advance of the substitution hearing. Nothing prevented JMS from requesting a continuance if it needed more time to prepare.

Nevertheless, JMS argues the substitution hearing did not constitute a fair trial because:  (1) Brown, rather than the District's governing board, conducted the hearing; (2) JMS did not have the opportunity to cross-examine witnesses; (3) the hearing was too short in light of the complex issues presented; and (4) JMS received insufficient notice of the specific factual bases for the substitution request.

What procedural safeguards are necessary to achieve due process "varies according to specific factual contexts" and depends on "a complexity of factors," including "nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding."  (*Hannah, supra,* 363 U.S. at p. 442.)  Due process ultimately requires that proceedings " ' "be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' [citation] . . . to insure that they are given a meaningful opportunity to present their case." ' "  (*Doe v. Regents of University of California*, *supra*, 5 Cal.App.5th at p. 1078.) As discussed above, the "decision to be made" at a section 4107

18

substitution hearing is entirely a construct of the Act and affects only those limited rights the Act itself creates for the limited purpose the Act identifies. (See Discussion *ante*, parts I & II.) In the context of that limited purpose and the limited nature of the rights affected, we conclude that a substitution hearing requires a correspondingly limited amount of process. We further conclude that, for the reasons discussed in more detail below, neither any of JMS's proffered deficiencies individually, nor their cumulative effect on the substitution hearing, deprived JMS of the limited due process required at a substitution hearing.

### A. *Hearing Officer*

JMS argues the substitution hearing did not constitute a fair trial because Brown, rather than the District governing board, conducted the hearing. As discussed above, we disagree with JMS's argument that section 4107 permits only the "awarding authority" *itself* to conduct a substitution hearing. (See Discussion *ante*, part I.)

### B. *Cross-Examination and Length of Proceedings*

JMS argues it did not have a meaningful opportunity to present its defense, because it could not cross-examine any witnesses[6] or sufficiently address the complex issues in the two hours Brown allotted for the hearing.

Nothing in section 4107 requires a hearing of a particular length or the opportunity to cross-examine witnesses. Nor does due process require "full rights of confrontation and cross-examination" at all

---

**6** Before and during the substitution hearing, JMS did not object to the lack of cross-examination. It has thus forfeited the issue. Nevertheless, we exercise our discretion to address JMS's argument, and conclude it has no merit.

19

administrative proceedings. (*Saleeby v. State Bar* (1985) 39 Cal.3d 547, 565.) Instead, as discussed above, it requires a reasonable opportunity to be heard, taking into account the "specific factual context." (*Hannah, supra,* 363 U.S. at p. 442.) We see nothing in the specific facts of this case to suggest that either the length of the hearing or the lack of cross-examination prevented JMS from meaningfully defending itself. At and before the hearing, JMS offered evidence and argument responding to Bernards's witnesses. It received Berrigan's statement prior to the hearing and presented a witness and legal arguments responding to the licensing opinions Berrigan offered. Bernards's two witnesses described the quality of JMS's work and the notices of deficiency, all of which JMS had received in advance of the hearing (first in the normal course of business, then in Bernards's May 3, 2016 Exhibit Book). At the hearing, JMS offered the in-person statement of its president and additional documents responding to Bernards's complaints. Brown did not limit the amount of written evidence or written advocacy that JMS could offer before or at the hearing.

We also consider the burden on the District—whose mission, as previously noted, is to educate, not to conduct hearings regarding construction disputes—were we to require a longer, more formal hearing. (*Hannah, supra,* 363 U.S. at p. 442 [due process analysis considers "the possible burden on that proceeding"]; see *Doe v. Regents of University of California, supra,* 5 Cal.App.5th at p. 1078 [university disciplinary hearing need not include all the formalities of a trial as this" 'would divert both resources and attention from a university's main calling, that is education' "].)

20

Finally, we consider the practical need to resolve these disputes quickly to prevent delay in completing a project. It would be inefficient to subject the timeline of a public works projects to potentially significant delays in order to accommodate that process.

On these facts, and in the context of a section 4107 hearing, neither the lack of cross-examination, nor the length of the substitution hearing denied JMS a reasonable opportunity to be heard.

### C. *Sufficiency of Notice*

Bernards's initial substitution request stated that JMS might not be licensed to perform "some portions" of the subcontract. Two days before the hearing, JMS learned the specific work Bernards felt JMS was unlicensed to perform: Hydronic piping and hydronic boiler work. This, JMS argues, does not comply with section 4107's notice requirement and did not afford JMS enough time to develop a robust defense to the licensing arguments. We disagree.

First, the District complied with the notice requirements in section 4107, subdivision (a) by informing JMS about the hearing more than five days in advance thereof (see § 4107, subd. (a)), and by telling JMS "in writing" the "reasons for the request" well before the District approved it. (*Ibid*.)

Second, notice comports with due process where it provides sufficient information, in light of the particular circumstances, to "fully and fairly apprise[] [an administrative litigant] of the charges with sufficient certainty to prepare his defense thereto." (*Stoumen v. Munro* (1963) 219 Cal.App.2d 302, 307.) Where a litigant receives "reasonable notice and a reasonable opportunity to be heard, that is all that is required." (*Drummey v. State Bd. of Funeral Directors* (1939) 13 Cal.2d 75, 80–81.) In the context of the statutory purpose of the Act, the limited legal consequences of a substitution decision, and

21

practical concerns regarding timing, we conclude JMS received such reasonable notice, sufficient to satisfy due process.

More than two weeks before the hearing, JMS stated that it "understand[s] that Bernards is contending JMS needs a C-36 (plumbing) license to install the hydronic and/or refrigerant piping that is integral to moving water and refrigerant within each of the systems JMS is installing." Thus, the only specific complaint JMS was first aware of two days before the hearing was the lack of licensure for the boiler work. Nonetheless, at the hearing, JMS failed to request a continuance to prepare additional evidence and argument to defend against Bernards's boiler licensure argument. Instead, JMS presented testimony and documents responsive to both the plumbing and boiler license issues.

JMS also contends that it did not receive sufficient notice of Bernard's substitution request based on a "fail[ure] or refus[al] to perform" under section 4107, subdivision (a)(3). The superior court concluded, however, that the evidence was insufficient to support substitution on this basis. Neither party has challenged that conclusion. Whether JMS received sufficient notice regarding this ground is therefore a moot question we need not address.

## III. Substantial Evidence Supports the Substitution Decision

Lastly, we turn to JMS's challenge to the sufficiency of the evidence supporting the Substitution Decision. The parties disagree as to the appropriate standard of review. JMS urges this court to conduct an independent review of the Substitution Decision, while the District maintains that substantial evidence review is appropriate. Because the Substitution Decision did not substantially affect a fundamental vested right (see Discussion *ante*, part II.B), the substantial evidence standard applies. We further conclude that substantial evidence supports Brown's ultimate decision to grant

22

Bernard's substitution request based on JMS's lack of a C-4 boiler license.

### A. *We Review the Substitution Decision for Substantial Evidence, Because the Decision Does Not Substantially Affect Any Fundamental, Vested Right*

Code of Civil Procedure section 1094.5 permits review of administrative actions by writ of mandate to determine "whether there was any prejudicial abuse of discretion." (Code Civ. Proc. § 1094.5, subd. (b).) Where the petitioner contends administrative findings are unsupported by the evidence, Code of Civil Procedure section 1094.5 contemplates two possible standards of review for the superior court, depending on the nature of the right involved. (*Strumsky*, *supra,* 11 Cal.3d at p. 32; Code Civ. Proc., § 1094.5, subd. (c).) If the administrative decision "substantially affects" a "fundamental[,] vested right," the superior court must exercise its independent judgment on the evidence. (*Strumsky*, *supra*, 11 Cal.3d at p. 32; *Bixby, supra*, 4 Cal.3d at p. 144.) In all other cases, the superior court will determine whether the administrative findings are "supported by substantial evidence in the light of the whole record." (Code Civ. Proc., § 1094.5, subd. (c).) The concern motivating a less deferential review of administrative decisions affecting fundamental rights is that such rights should not be "extin[guished] or abridge[d] by a body lacking *judicial* power." (*Frink v. Prod* (1982) 31 Cal.3d 166, 176 (*Frink*).)

A Court of Appeal then reviews for substantial evidence, but *what* the appellate court reviews depends, again, on whether a fundamental vested right is involved. If it is, "and the trial court therefore exercised independent judgment, it is the trial court's judgment that is the subject of appellate court review. [Citations.]

23

On the other hand, if the superior court properly applied substantial evidence review because no fundamental vested right was involved, then the appellate court's function is identical to that of the trial court. It reviews the administrative record to determine whether the agency's findings were supported by substantial evidence. (*JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1058.)

As discussed above, the Substitution Decision regarding JMS affects *only* JMS's rights under section 4107, including its right to work on the project, absent a statutorily enumerated basis for substitution. (See Discussion *ante*, part II.B.) This is not a fundamental vested right. (See *ibid.*) JMS nevertheless argues that the Substitution Decision will *indirectly* affect other rights, and that those indirectly-affected rights are fundamental.

JMS first suggests the Substitution Decision's findings that JMS " 'failed and refused' to perform" and was unlicensed to perform some of the subcontract work has set in motion a chain of events that threaten JMS's financial viability. But the indirect causal relationships JMS posits between the Substitution Decision and events potentially affecting JMS's financial viability do not transform the nature of that decision, such that it "substantially affects" JMS's ability to do business. For example, JMS argues these findings have "impaired JMS's bonding capacity, which means it cannot obtain public works projects." Yet the Substitution Decision has no binding legal effect on JMS's ability to procure bonding; the District could not and did not consider that issue at the substitution hearing. Similarly, JMS contends the Substitution Decision led to indemnification claims against JMS in excess of $3 million. But again, these claims—not the Decision—are the source of the financial losses JMS fears. What financial effect, if any, these indemnification claims will have on JMS

depends on separate judicial proceedings in which, again, the Substitution Decision can have no preclusive effect.

JMS next argues the Substitution Decision significantly affects JMS's fundamental right to its HVAC license. JMS identifies the following causal chain: The Substitution Decision found that JMS had performed work for which JMS was not properly licensed; this is a basis for the state licensing board to discipline JMS (Bus. & Prof. Code, § 7090); and such discipline could include terminating JMS's current HVAC license. (Bus. & Prof. Code, § 7095 [modes of discipline].) But again, the Substitution Decision can have no preclusive effect in the CSLB's licensing decisions or any judicial review of those licensing decisions.

To support its arguments that indirect or delayed effects sufficiently implicate a fundamental vested right, JMS relies primarily on *Wences v. City of Los Angeles* (2009) 177 Cal.App.4th 305. *Wences* involved a police department's official reprimand for misconduct. (*Id.* at p. 311). The reprimand was placed in Wences's employment file and did not have any immediate financial or employment consequences. (*Id.* at p. 316.) The court nevertheless concluded the reprimand significantly affected Wences's fundamental right to public employment, because it would affect any future police department discipline or employment decisions. (*Ibid.*)

JMS's reliance on *Wences* is misplaced not only because the requisite causal connection between the Substitution Decision and HVAC licensure is lacking, but also because the policy motivating *Wences* is wholly inapplicable here. Independent review of evidence presented to an administrative entity is only necessary where the right affected is "too important to the individual to relegate it to exclusive administrative extinction." (*Bixby*, *supra*, 4 Cal.3d at p. 144.) Put differently, the goal is to prevent administrative

25

decision makers from acting as largely unchecked final arbiters of fundamental rights. This risk existed in *Wences*, because the police department was the arbiter of both the reprimand at issue and all future employment decisions that reprimand might affect. Thus, deferring too strongly to the police department threatened to make it a nonjudicial final arbiter of Wences's fundamental right to public employment. Under such circumstances, substantial evidence review was insufficient.

By contrast, the District is not the arbiter of whether JMS retains its HVAC license. The CSLB must make that determination independent of the Substitution Decision itself. In addition, JMS will have the opportunity to seek judicial review of any such CSLB decision, and the court conducting such a review will consider the nature of JMS's right to its HVAC license in selecting the appropriate standard of review to apply. Thus, our decision that a substantial evidence standard of review applies to the Substitution Decision will not leave the fate of JMS's HVAC license in nonjudicial hands—far from it. *Wences* is distinguishable on this basis and does not counsel in favor of a heightened standard of review.

Finally, the unique nature of a section 4107 substitution decision renders a deferential standard of review particularly appropriate. Section 4107 presents a "regulatory interference with contractual rights," such that "very different policies govern" than would in a purely regulatory context. (*Kawasaki Motors Corp.*, *supra*, 85 Cal.App.4th at p. 204 [distinguishing "privilege to operate a Kawasaki dealership" from a right to renew a city permit].) Moreover, in determining the scope of our review, we are cognizant of the goals of the statute; with these in mind, we will not be quick to second-guess the findings of awarding authorities, to which section 4107 seeks to give *more* control, not less.

26

The superior court therefore correctly applied the substantial evidence standard of review, and we review "the agency's decision, rather than the trial court's decision" under the substantial evidence standard as well. (*Schafer v. City of Los Angeles* (2015) 237 Cal.App.4th 1250, 1261.)

This standard of review is highly deferential, and we must " 'resolv[e] all conflicts in the evidence and draw[] all inferences in support of [the administrative findings].' " (*Tennison v. California Victim Comp. & Government Claims Bd.* (2007) 152 Cal.App.4th 1164, 1180-1181.) A review for substantial evidence tests only whether there is substantial evidence to support the decision, not whether other facts in the record contradict that evidence. (*Escamilla v. Department of Corrections & Rehabilitation* (2006) 141 Cal.App.4th 498, 514.) "[S]ubstantial" refers to the quality, not the quantity of the evidence presented. (*Hope v. California Youth Authority* (2005) 134 Cal.App.4th 577, 589.)

### B. *Substantial Evidence Supports the Finding That JMS Was Not Licensed to Perform the Boiler Work Set Forth in the Specification*

At the substitution hearing, the parties presented conflicting testimony on whether the boiler work was "incidental and supplemental" or "essential" to HVAC work. Messica stated that it is; Berrigan offered his written opinion that it is not. Berrigan further opined that JMS's C-20 HVAC license did not permit JMS to perform the boiler work under the HVAC Specification. We must defer to the administrative decision maker regarding credibility of witnesses and the relative weight to give two pieces of conflicting testimony. (*City of Fontana v. California Dept. of Tax & Fee Administration* (2017) 17 Cal.App.5th 899, 919 (*City of Fontana*) [" ' "[i]t is for the agency to weigh the preponderance of conflicting evidence" ' "]; see *Leff v. Gunter*

27

(1983) 33 Cal.3d 508, 518 [" 'we have no power to judge . . . the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence' "].) Under the substantial evidence standard, courts may reverse an agency's decision only if, based on the evidence before the agency, "a reasonable person could not reach the conclusion reached by the agency." (*City of Fontana*, *supra*, 17 Cal.App.5th at p. 919.) We have no such basis for second-guessing Brown's decision to believe Berrigan's testimony over Messica's.[7] Berrigan worked for several years for CSLB and was responsible for determining whether a particular contractor was licensed to perform a particular project. Berrigan also has offered expert testimony in other matters regarding which licenses CSLB would require for a particular construction project.[8] (See, e.g., *Ron Yates Construction Co. v. Superior Court* (1986) 186 Cal.App.3d 337, 347.) On this record, and given the deferential nature of our review, substantial evidence supports the District's finding that JMS was not licensed to perform the boiler work in the HVAC Specification.

---

[7] We need not address JMS's argument that the Berrigan statement constitutes hearsay, as JMS failed to object to the declaration on this basis at the substitution hearing. Nor are we convinced that case law limiting the use of hearsay in administrative proceedings necessarily applies in the limited context of section 4107 substitution hearings, given their informal nature, narrow scope, and minimal preclusive effect.

[8] JMS argues that the Berrigan statement offers legal conclusions masquerading as expert opinion and thus cannot provide "substantial evidence." JMS did not object on this basis at the substitution hearing and therefore has forfeited the issue.

**C.** ***Substantial Evidence Does Not Support the Finding That JMS Was Not Licensed to Perform the Plumbing Work Set Forth in the HVAC Specification***

The Berrigan statement and the parties' briefing discuss two distinct categories of work for which the District contends JMS was not licensed: plumbing work and boiler work. As we have discussed above, sufficient evidence supports Brown's decision regarding the boiler work. Berrigan, however, expressly disclaimed offering any opinion on whether "the extensive piping work that JMS performed on the project was outside of the C-20 Classification," though he noted such work "could be performed by a C-36 Plumbing Classification." He likewise offered no opinion about whether that plumbing work is "essential" or "incidental and supplemental" to HVAC work (and, thus, according to JMS, work covered by JMS's HVAC license). (See Factual and Procedural Background *ante*, part B.) As the Berrigan statement is silent on this issue, the only evidence the parties offered regarding plumbing licensure is (1) Messica's testimony that such work *is* "essential" to HVAC work, and (2) the over $1.6 million scheduled value of plumbing work covered by the HVAC Specification, which the Substitution Decision cites as supporting the finding that such work is not "incidental and supplemental" to approximately $8 million worth of HVAC work. Even affording great deference to Brown's assessment of the evidence, and even acknowledging his familiarity with the project, we cannot accept Brown's conclusion that the value or extent of the plumbing work alone determines its relationship to HVAC work. And because no other evidence supports the conclusion regarding JMS's licensure to perform the plumbing work in the HVAC Specification, the finding fails the substantial evidence test. In order for substantial evidence to support the Substitution Decision, we need only find substantial evidence

supporting one of the grounds for substitution the decision identifies. Thus, in light of our previous conclusion that substantial evidence supports Brown's approval of the substitution based on JMS's lack of boiler licensure, the lack of substantial evidence supporting substitution based on plumbing licensure issues does not require reversal of the trial court's decision.

## IV.  The Court Properly Denied JMS's Petition

Because Brown had jurisdiction to hold the substitution hearing, because that hearing afforded JMS the limited due process appropriate in the context of section 4107, and because substantial evidence supports Brown's Substitution Decision, we conclude that the superior court did not err in denying JMS's petition for a writ of administrative mandamus. We note, however, that our conclusion is driven by the very limited nature of our role as a court reviewing a section 4107 substitution decision.  In this role, we may not and do not reach any conclusions regarding whether or how JMS has performed under the subcontract, or the type of work JMS is licensed to perform.  Ours is to determine whether the record before us contains substantial evidence supporting the Substitution Decision. The Substitution Decision is not a typical administrative decision. Rather, it is the product of a unique statutory scheme with very specific, limited objectives, and thus affects very specific, limited rights.  With the scope and nature of these objectives and effects in mind, based on the record before us, and applying a deferential standard of review to this type of quasi-administrative action, we affirm.

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.

ROTHSCHILD, P. J.

We concur.

CHANEY, J.

BENDIX, J.

Filed 1/3/19

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| JMS AIR CONDITIONING AND APPLIANCE SERVICE, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> SANTA MONICA COMMUNITY COLLEGE DISTRICT et al., <br><br> Defendants and Respondents; <br><br> BERNARDS BROS., INC., <br><br> Real Party in Interest and Respondent. | B284068 <br><br> (Los Angeles County Super. Ct. No. BS163309) <br><br><br> ORDER CERTIFYING PUBLICATION OF OPINION |

THE COURT:

    The opinion in the above-entitled matter filed on December 17, 2018, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

ROTHSCHILD, P. J.        CHANEY, J.        BENDIX, J.