Filed 9/29/21  Volpe Co. v. Sausal Corp. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| VOLPE CO., INC.,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SAUSAL CORP.,<br><br>    Defendant and Appellant. | A157577, A159372<br><br>(Marin County<br>Super. Ct. No. CIV1402511) |

Numerous laws regulate disputes between a primary contractor and its subcontractors in the construction of public projects.  Two such laws are at issue in this case: Public Contract Code section 4107,[1] which, among other things, regulates the authority of a prime contractor to substitute a new subcontractor in place of the subcontractor listed in the original bid; and Business and Professions Code section 7108.5, a prompt payment statute.  In a jury trial, the plaintiff subcontractor prevailed on a breach of contract claim resting on section 4107, and a prompt payment claim, and was awarded prejudgment interest and attorney fees.  We reverse judgment on the subcontractor's breach of contract claim, direct modification of the award pursuant to the prompt payment statute, and remand for further proceedings.

---

[1] All undesignated section references are to the Public Contract Code.

In the summer of 2012, the City of Novato (City) awarded a contract to build a new City office building (Project) to Sausal Corporation (Prime Contractor). Prime Contractor entered into a subcontract (Contract) with Volpe Co., Inc. (Subcontractor) to perform grading, paving, and underground utility work on the Project, for a payment of approximately $400,000. Over the course of the Project, the Contract amount grew to more than $650,000 because of change orders approved by the City.

Subcontractor began work on the Project in August 2012. It continued working through the spring of 2013, and then paused its work on the Project as other Project work was performed. In late summer, Prime Contractor reached out to Subcontractor to schedule its return to the Project site. The Subcontractor's return did not comply with the Prime Contractor's timeframe, and the parties dispute the reasons for this. In September, Subcontractor did return but its work progressed more slowly than Prime Contractor wanted; the parties submitted conflicting evidence as to whether the delays were primarily due to Subcontractor's failure to return to the Project sooner and to sufficiently staff the Project work when it did return, or to mistakes by other subcontractors and unforeseen conditions that impeded Subcontractor's progress.

In October 2013, Prime Contractor brought in another party, G.D. Nielson Construction (Nielson), to perform some of the work remaining on the Project. Subcontractor also continued to work on the Project in October and November. However, Prime Contractor did not pay Subcontractor for any of the work it performed following its return to the Project in September 2013.

---

[2] We recite only those background facts relevant to our resolution of the appeals.

Prime Contractor took the position that Subcontractor owed it the amount it paid Nielson for work within the scope of the Contract, and that the amount it paid Nielson was greater than the remaining amount it owed to Subcontractor.

In 2014, Subcontractor filed the underlying lawsuit for breach of contract and other claims.  Following a jury trial, the jury found that Prime Contractor had breached the Contract, and that Subcontractor had incurred approximately $380,000 in damages.  The jury also found that as of December 31, 2013, approximately $260,000 of this damages amount had been paid to Prime Contractor by the City for work performed by Subcontractor.  Prime Contractor filed a motion for judgment notwithstanding the verdict or a new trial, which the trial court denied.  The court granted Subcontractor's motions for prejudgment interest, prompt payment penalties (Bus. & Prof. Code, § 7108.5), and attorney fees, and issued judgment for more than $1 million.  Prime Contractor appealed separately from the judgment and the attorney fee order, and this court consolidated the appeals.[3]

_____

[3] Subcontractor complains that Prime Contractor failed to provide Subcontractor with copies of the reporter's transcripts designated as part of the record on appeal and suggests Prime Contractor improperly submitted these transcripts to this court.  Prime Contractor's designation of the record permissibly requested reporter's transcripts be provided by the reporters.  Pursuant to the Rules of Court, the reporter files the original and one copy of the requested transcripts with the superior court, which in turn provides the original to this court and the copy to the appellant.  (Cal. Rules of Court, rules 8.130(f)(1), 8.150(a).)  Prime Contractor was not obligated to provide Subcontractor with a copy.  (See Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2021) ¶ 4:273 ["Respondent and other parties can make arrangements with the clerk and/or reporter to purchase additional copies of the record."].)

## DISCUSSION

### I. *Public Contract Code Section 4107*

The jury's verdict finding Prime Contractor breached the Contract was based on a provision in Prime Contractor's contract with the City, incorporated by reference into the Contract, obliging Prime Contractor to comply with section 4107. Section 4107 provides that a prime contractor may not "[s]ubstitute a person as subcontractor in place of the subcontractor listed in the original bid, except that the awarding authority, or its duly authorized officer, may . . . consent to the substitution of another person as a subcontractor in [certain enumerated situations]," with exceptions not relevant here. (§ 4107, subd. (a).) The statute further provides, "Prior to approval of the prime contractor's request for the substitution, the awarding authority, or its duly authorized officer, shall give notice in writing to the listed subcontractor of the prime contractor's request to substitute and of the reasons for the request. . . . The listed subcontractor who has been so notified has five working days within which to submit written objections to the substitution to the awarding authority. Failure to file these written objections constitutes the listed subcontractor's consent to the substitution. [¶] If written objections are filed, the awarding authority shall give notice in writing of at least five working days to the listed subcontractor of a hearing by the awarding authority on the prime contractor's request for substitution." (*Ibid.*)

Prime Contractor raises several arguments challenging the judgment in favor of Subcontractor on this claim. We agree with one of its arguments, and reverse and remand the breach of contract claim.

4

A.    *Additional Factual Background*

Prime Contractor's contract with the City included the following provision: "7.6. No Contractor whose Bid is accepted shall, without consent of the awarding authority and in full compliance with section 4100, et seq, of the Public Contract Code, including, without limitation, sections 4107, 4107.5, and 4109 of the Public Contract Code . . . : [¶] 7.6.1. Substitute any person as a Subcontractor in place of the Subcontractor designated in the original Bid . . . ."  Prime Contractor does not dispute that this provision was incorporated by reference into the Contract.[4]  Subcontractor was designated in Prime Contractor's original bid.

On October 18, 2013—the day Nielson started working on the Project— Prime Contractor emailed the City's city manager, "Just want to let you know that we had the new crews start augmenting [Subcontractor's] forces today. After today, any underground utility, grading, and asphalt work in the parking lot will be completed by other crews. . . . We will restrict [Subcontractor] to working on the water to the building and in the even[t] they are not completed by Wednesday of next week we will have other crews take over that work also."  The city manager replied, "Much appreciated! It is what is needed to get us in.[5] Thanks."  It is undisputed that the City failed

---

[4] In a footnote, Prime Contractor cursorily contends that a breach of contract claim cannot be based on a violation of section 4107.  The argument is insufficiently raised and we need not, and do not, address it.  (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 419 ["An appellant cannot bury a substantive legal argument in a footnote and hope to avoid waiver of that argument."].)

[5] The City wanted to move into the Project building by late October 2013, the end of the City's lease at its then-current building.

5

to provide Subcontractor with written notice of the substitution or an opportunity to object.

B.     *Legal Background*

"The Legislature enacted the Subletting and Subcontracting Fair Practices Act (§ 4100, et seq.), of which section 4107 is a part, to prevent 'bid shopping' and 'bid peddling' after the award of a public contract and to give the awarding authority the opportunity to investigate and approve the initial subcontractors and any replacements." (*Titan Electric Corp. v. Los Angeles Unified School Dist.* (2008) 160 Cal.App.4th 188, 202, fn. omitted (*Titan Electric*).) " 'Bid shopping is the use of the low bid already received by the general contractor to pressure other subcontractors into submitting even lower bids.  Bid peddling . . . is an attempt by a subcontractor to undercut known bids already submitted to the general contractor in order to procure the job.' " (*Id.* at p. 202, fn. 6.)  "The Legislature found that these practices result in 'poor quality of material and workmanship to the detriment of the public, deprive the public of the full benefits of fair competition among prime contractors and subcontractors, and lead to insolvencies, loss of wages to employees, and other evils.' (§ 4101.)" (*JMS Air Conditioning & Appliance Service, Inc. v. Santa Monica Community College Dist.* (2018) 30 Cal.App.5th 945, 951 (*JMS Air Conditioning*).)

"The Act seeks to prevent these evils by 'provid[ing] an opportunity to the awarding authority to investigate and approve the initial subcontractors and any proposed substitutions.' [Citation.]  It requires that a general contractor specifically list in a bid for public work the subcontractors it intends to use for the project.  (§ 4104.)  Once the awarding authority accepts a bid, the Act permits the general contractor to substitute out a listed subcontractor only on certain enumerated bases, all but one of which relate to

6

the subcontractor's ability or willingness to perform the work, or to perform it appropriately.  (§ 4107, subd. (a).)  The general contractor must receive approval from the awarding authority for any such substitution, and the Act establishes procedures for such requests.  (*Ibid*.)  These procedures require that a subcontractor receive written notice of a substitution request and, if the subcontractor timely objects, 'the awarding authority' must hold a hearing to decide if it will allow the substitution."  (*JMS Air Conditioning, supra,* 30 Cal.App.5th at p. 951, fn. omitted.)

"[S]ubcontractors listed in a public bid enjoy limited statutory rights: The right to 'perform the subcontract unless statutory grounds for a valid substitution exist' and the right to a section 4107 hearing, if the subcontractor timely objects to a substitution request.  [Citations.]  These rights are ancillary to the Act's larger objectives; the Act did not set out to create and does not focus on rights for subcontractors."  (*JMS Air Conditioning, supra,* 30 Cal.App.5th at p. 958.)

C.    *Bid Peddling/Shopping*

Prime Contractor first argues that the application of section 4107 is limited to cases involving bid peddling or bid shopping.  It is undisputed that no such conduct occurred here.  We conclude the statute is not so limited.

To be sure, one of the primary statutory purposes was to prevent these practices.  (§ 4101; *JMS Air Conditioning, supra,* 30 Cal.App.5th at p. 951 ["The Act stems from legislative concerns about the practices of 'bid shopping' and 'bid peddling' on public works projects."].)  However, the plain language of the statute does not limit its application to such conduct, and Prime Contractor points to no cases so limiting the statute.  Instead, cases have considered the statutory purposes in construing the statute, but have applied it to other conduct.  (See *Titan Electric, supra,* 160 Cal.App.4th at p. 206

7

[applying § 4107 in case where "no bid shopping by [the prime contractor] or bid peddling by [the subcontractor] occurred"].) Moreover, the statute is also intended to give "the awarding authority the opportunity to investigate and approve the initial subcontractors and any replacements." (*Titan Electric,* at p. 202; see also *Southern California Acoustics Co. v. C. V. Holder, Inc.* (1969) 71 Cal.2d 719, 725–726 [statute's purposes include "providing the awarding authority with an opportunity to approve substitute subcontractors"].)

Accordingly, while we construe the statute in light of its purposes, including the prevention of bid shopping and peddling, we decline to limit its application to such conduct.

D.    *Prime Contractor's Statutory Obligations*

Prime Contractor argues that, if section 4107 applies, Prime Contractor's only obligation under the statute was to obtain the City's consent for the substitution. Subcontractor argued below, and argues here, that under section 4107, the City's consent was not valid unless and until the City provided Subcontractor with written notice and, in the absence of such notice, Prime Contractor substituted Subcontractor without consent in violation of section 4107. We review this question of statutory interpretation de novo (*Manriquez v. Gourley* (2003) 105 Cal.App.4th 1227, 1233), and agree with Prime Contractor.

First, we see no indication in the statutory language that a prime contractor must independently verify that a public entity has complied with the notice requirement before relying on the public entity's consent. The statute provides a prime contractor "may not: [¶] (a) Substitute a person as subcontractor in place of the subcontractor listed in the original bid, *except that the awarding authority . . . may . . . consent to the substitution* of another person as a subcontractor in any of the following situations . . . ." (§ 4107,

8

subd. (a), italics added.)  Thus, the prime contractor is prohibited from substitution except if it receives consent from the public entity.  The statute separately provides, "Prior to approval of the prime contractor's request for the substitution, *the awarding authority . . . shall give notice in writing to the listed subcontractor* of the prime contractor's request to substitute and of the reasons for the request."  (§ 4107, subd. (a), italics added.)  The public entity is required to provide notice prior to approving the request; the statute does not say the prime contractor cannot rely on the public entity's consent unless notice has been provided.  To construe the statute otherwise would effectively make prime contractors liable for public entities' noncompliance.  We see no basis in the statutory language to impose such liability.

In addition, such a construction would not serve the statutory purposes "to prevent 'bid shopping' and 'bid peddling' after the award of a public contract and to give the awarding authority the opportunity to investigate and approve the initial subcontractors and any replacements."  (*Titan Electric, supra,* 160 Cal.App.4th at p. 202, fn. omitted.)

A similar situation was presented in *W.J. Lewis Corp. v. C. Harper Construction Co.* (1981) 116 Cal.App.3d 27 (*W.J. Lewis*).  In that case, a subcontractor alleged a prime contractor violated section 4107.  (*Id.* at p. 28.)  It was undisputed that the prime contractor sought permission to substitute and that the public entity granted consent.  (*Id.* at p. 30.)  Instead, the subcontractor claimed it was not provided with notice of the substitution request.  (*Ibid.*)  The court reasoned, "if such be the fact, [the prime contractor] is not at fault because it, rather than the agency, was not required by the statute to give notice of the request."  (*Ibid.*)  The court pointed to a later-enacted provision of the Act, section 4107.5, which "expressly requires the prime contractor, itself, to give notice of the proposed

9

change."[6] (*W.J. Lewis,* at p. 31.) When the Legislature enacted section 4107.5, it "did not amend section 4107 to impose such a requirement on the prime contractor, nor did it otherwise impose such a requirement for requests grounded on section 4107. [¶] In the light of that legislative action (more properly nonaction) we must conclude that no statutory duty rests on a prime contractor to, itself, give to a subcontractor notice of its desire to substitute except [pursuant to section 4107.5]. Absent such a duty in this case, no liability on the part of the [prime contractor] exists." (*W.J. Lewis,* at p. 31.) Although *W.J. Lewis* did not address the specific argument presented here, its reasoning supports the conclusion a subcontractor cannot demonstrate a prime contractor violated section 4107 solely on the ground that the public entity failed to provide notice.

Accordingly, we agree with Prime Contractor that it complied with section 4107 if it obtained the City's consent for the substitution, regardless of the City's failure to provide notice pursuant to section 4107.[7]

---

[6] Section 4107.5 provides, in relevant part, "The prime contractor as a condition to assert a claim of inadvertent clerical error in the listing of a subcontractor shall within two working days after the time of the prime bid opening by the awarding authority give written notice to the awarding authority and copies of that notice to both the subcontractor he or she claims to have listed in error and the intended subcontractor who had bid to the prime contractor prior to bid opening."

[7] We note that Subcontractor was not without a remedy for the City's failure to provide notice: "a subcontractor that believes an awarding authority has violated the Act's statutory mandate may be entitled to bring an administrative mandamus under Code of Civil Procedure section 1094.5." (*E. F. Brady Co. v. M. H. Golden Co.* (1997) 58 Cal.App.4th 182, 192.) In addition, although the parties do not discuss the statutory limitation that a public entity's consent to substitution can only be granted in certain enumerated situations, this also appears to be a requirement imposed on the public entity, reviewable for substantial evidence in a mandamus action.

E.  *Evidence of Consent*

Prime Contractor argues the undisputed evidence shows the City consented to the substitution.  Subcontractor does not dispute that the city manager's October 18, 2013 email demonstrates this consent.  Nor could it reasonably do so:  the email was from the city manager, expressed gratitude to Prime Contractor for the substitution, and indicated an understanding that the substitution was necessary for the timely completion of the Project.

Instead, Subcontractor argues consent provided after the substitution does not satisfy section 4107.  On this issue, *Titan Electric* is instructive.  In that case, the prime contractor requested substitution and, after receiving notice of the request, the subcontractor objected and demanded a hearing. (*Titan Electric, supra,* 160 Cal.App.4th at p. 193.)  The public entity held hearings but, by the time it granted the substitution request, the substitute subcontractor had already completed the work.  (*Ibid.*)  The original subcontractor petitioned for writ of administrative mandate challenging the public entity's decision, arguing the substitution could not take place before the public entity's consent.  (*Ibid.*)  The Court of Appeal rejected the challenge, holding "section 4107 contemplates that the awarding authority's consent to substituting *out* a listed subcontractor and substituting *in* a proposed replacement will occur *before* the prime contractor permits the replacement to perform any work.  However, a deviation from this chronology . . . is permissible so long as the procedure used actually complies with the substance of the reasonable objectives of the statute:  namely, the prevention of bid peddling and bid shopping after the award of a public works contract,

_____

(*JMS Air Conditioning, supra,* 30 Cal.App.5th at pp. 964–967 [public entity's decision that substitution warranted under certain statutory situations reviewed on mandamus for substantial evidence].)

11

and the providing of an opportunity to the awarding authority to investigate the proposed replacement subcontractor before consenting to substitution." (*Ibid.*) The "procedural irregularity" of the public entity granting consent after the replacement subcontractor completed the work, did not, "under the facts here, . . . violate the purposes of the statute." (*Id.* at p. 206.) The record showed "no bid shopping . . . or bid peddling . . . occurred," and therefore "the statutory goal of preventing bid shopping and bid peddling was preserved." (*Ibid.*) Moreover, "[t]he statutory purpose of giving the [public entity] the opportunity to investigate [the replacement subcontractor] so as to ensure the quality of the work was also met" because the public entity "had the opportunity to investigate [the replacement subcontractor] before consenting to substitution" and "[n]othing in the record suggests" the public entity found the replacement subcontractor's "work to be substandard." (*Id.* at pp. 206–207.)

Here, as in *Titan Electric,* no bid shopping or bid peddling occurred, the City had the opportunity to investigate Nielson before granting consent, and there is no indication that Nielson's work was substandard. Moreover, the request was granted just after Nielson's substitution began, and long before the substitute work was complete. Subcontractor argues *Titan Electric* is inapplicable because in that case the public entity provided notice to the subcontractor and held a hearing, albeit a delayed one. But, as we explained above, the notice requirement was the City's obligation, not Prime Contractor's. We decline to find Prime Contractor failed to substantially comply with the statute based on the City's statutory duties.

F. *Conclusion*

We agree with Prime Contractor that the City's failure to provide written notice to Subcontractor did not constitute a violation of Prime

12

Contractor's obligations under section 4107. We further agree with Prime Contractor that its receipt of the City's consent shortly after Nielson started work on the Project does not render Prime Contractor noncompliant. Accordingly, we will reverse the judgment with respect to Subcontractor's breach of contract claim.[8]

However, the failure to comply with section 4107 was only one of the breach theories asserted by Subcontractor. Under the special verdict form, once the jury determined Prime Contractor breached the Contract by failing to comply with section 4107, it did not determine whether Prime Contractor committed any other breach. We will therefore remand Subcontractor's breach of contract claim rather than direct entry of judgment for Prime Contractor on this claim.

II.    *Business and Professions Code Section 7108.5*

The jury found that, as of December 31, 2013, Prime Contractor had not paid Subcontractor $263,552 it had received from the City for Subcontractor's work on the Project. We reject most of Prime Contractor's challenges, but we agree the amount should be slightly reduced.[9]

---

[8] Because of this conclusion, we need not address Prime Contractor's arguments that: the relevant Contract provision imposed fewer requirements than section 4107; the substitution was pursuant to subdivision (b) of section 4107, not subdivision (a); section 4107 only applies to the substitution of base contract work; and Subcontractor failed to exhaust administrative remedies. In addition, we need not decide whether the trial court erred in awarding prejudgment interest on the contract damages.

[9] Neither party suggests that the prompt payment penalties award must be vacated if this court reverses the breach of contract claim, and we see no basis to so conclude.

A.    *Legal Background*

" 'California has a series of so-called "prompt payment" statutes that require general contractors to pay their subcontractors within specified, short time periods, and that impose monetary penalties for violations.' [Citation.] These prompt payment statutes serve a ' "remedial purpose: to encourage general contractors to pay timely their subcontractors and to provide the subcontractor with a remedy in the event that the contractor violates the statute." [Citation.]' [Citation.] [¶] One such statute is Business and Professions Code section 7108.5, which requires a general contractor to pay its subcontractors their respective shares of a progress payment within 10 days [now seven days, see stats. 2011, ch. 700, § 1] of receiving that payment from the project's owner, unless the parties agree otherwise in writing.  If the general contractor fails to timely pay, the subcontractor may recover a penalty fixed at 2 percent of the amount due per month for every month the payment is not made.  [Citations.] [¶] However, a contractor may withhold progress payments from a subcontractor without exposure to the 2 percent penalty if there is a good faith dispute between the general contractor and the subcontractor over the amount owed." (*FEI Enterprises, Inc. v. Yoon* (2011) 194 Cal.App.4th 790, 795–797, fns. omitted.)

B.    *Good Faith Dispute*

With respect to the good faith nature of the dispute, the jury was instructed: "any funds withheld by the prime contractor based on an alleged good-faith dispute must be directly related to the adequacy of the construction work for which the payment is consideration. [¶] Controversies concerning unrelated work will not excuse the delay in payment."  Prime Contractor argues the instruction's limitation to "the adequacy of the construction work for which the payment is consideration" was too narrow.

14

In *United Riggers & Erectors, Inc. v. Coast Iron & Steel Co.* (2018) 4 Cal.5th 1082 (*United Riggers*), the Supreme Court held that the good faith dispute exception applicable in all prompt payment statutes, including the one at issue here, "excuses payment only when a good faith dispute exists over a statutory or contractual precondition to that payment, such as the adequacy of the construction work for which the payment is consideration. Controversies concerning unrelated work or additional payments above the amount both sides agree is owed will not excuse delay; a direct contractor cannot withhold payment where the underlying obligation to pay those specific monies is undisputed." (*Id.* at p. 1085; see also *id.* at p. 1097.) For example, in *United Riggers,* which involved the withholding of a retention payment, the Supreme Court held that "only withholding for disputes over the retention payment itself is allowed." (*Id.* at p. 1092.)

Prime Contractor argues it withheld money from Subcontractor because Subcontractor "would not timely complete its work, had forced [Prime Contractor] to hire Niels[o]n and . . . Niels[o]n properly took over some of [Subcontractor's] work;" Prime Contractor therefore "had a contractual basis to withhold money;" and this constituted a good faith dispute over the withheld funds. We assume, without deciding, that a prime contractor's contention that a subcontractor performed certain work too slowly, and that the slow pace required the prime contractor to hire another company to finish the work encompassed within the subcontractor's contract, constitutes a good faith dispute and was not included in the jury instruction.

Even so assuming, Prime Contractor fails to demonstrate prejudice. Subcontractor argued below that it had performed essentially all of the work covered by the Contract, and that Nielson was brought in to perform work *not* covered by the Contract in response to an unforeseen issue discovered in

15

early October. The jury accepted Subcontractor's calculation of the value of the work Subcontractor had performed for which the City had paid Prime Contractor, essentially the amount of the Contract. (See *post,* pp. 17–18.) Therefore, the jury necessarily found that Subcontractor performed nearly all of the Contract work and Nielson performed work that was not covered by the Contract. Thus, any dispute over Subcontractor's liability for Nielson's work is indisputably about "unrelated work" and cannot excuse Prime Contractor's prompt payment obligations. (See *United Riggers, supra,* 4 Cal.5th at p. 1085.) For the same reason, we reject Prime Contractor's argument that the trial court erred in denying its motion for judgment notwithstanding the verdict on this issue.

C.    *Substantial Evidence*

Prime Contractor argues the jury's determination of the amount of money Prime Contractor received from the City for Subcontractor's work but failed to pay to Subcontractor is not supported by substantial evidence.

The jury found the amount that Prime Contractor was paid by the City for Subcontractor's work on the Project but that Prime Contractor did not pay Subcontractor as of December 31, 2013 was $263,552. In Subcontractor's closing arguments, counsel urged the jury to find this precise amount based on the total Contract amount of $656,036.04, plus $6,331.40 for additional sewer reroute work, minus payments to Subcontractor of $398,714.94.[10]

Prime Contractor first argues there was no evidence the City paid Prime Contractor anything at all. We disagree. The City's privately-

---

[10] The actual amount based on these figures is $263,652.50. Subcontractor apparently rounded down to the nearest dollar. In addition, as discussed below, Subcontractor made a $100 mathematical error in Prime Contractor's favor.

contracted construction manager testified she reviewed Prime Contractor's monthly bills, submitted them to the City for payment, and never heard any complaints that the City was not timely paying the bills. Prime Contractor's project manager testified the City was supposed to pay Prime Contractor within 30 days of receiving a bill, and he was not aware of any issues with the City's monthly payments to Prime Contractor. Prime Contractor's pay application for December 2013 indicates the City had already paid Prime Contractor nearly $9 million. The jury could reasonably infer from this evidence that the City promptly paid Prime Contractor's bills. (*County of Kern v. Jadwin* (2011) 197 Cal.App.4th 65, 73 ["substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom"].)

Prime Contractor next contends there was no evidence of the amount Prime Contractor billed the City for Subcontractor's work. We again disagree. First, there was evidence that the value of Subcontractor's work was close to $656,036.04 plus $6,331.40: (1) Both Subcontractor's owner and Prime Contractor's project manager testified that the amount of the Contract, including approved additional work, was $656,036.04; (2) Subcontractor presented evidence that it had completed all but $28,000 of the Contract work by the end of October, and that it completed "a big part" of the remaining work in November; and (3) Subcontractor submitted evidence that it performed an additional $6,331.40 of work which should have been added to the Contract. This evidence suggests Subcontractor performed close to the full value of the Contract work; Subcontractor concedes in its response brief that the evidence shows $693.75 worth of Contract work was not completed. A deduction of $693.75 was not reflected in the calculations adopted by the jury, and we will direct the judgment be reduced accordingly. Second, there was evidence that Prime Contractor promptly billed the City for work

17

performed by its subcontractors: Prime Contractor's project manager testified that each month he received billings from subcontractors based on the amount of work they performed that month, and that he then compiled the total billings onto a standard industry form application for payment which he submitted to the City. Prime Contractor argues that Subcontractor failed to submit the proper paperwork for its billings, but the record citations provided do not demonstrate that Prime Contractor did not submit any of Subcontractor's billings for payment.[11] The jury could reasonably infer that Prime Contractor had billed the City for all of the work completed by Subcontractor.

Prime Contractor argues there is no evidence of the amount Prime Contractor paid Subcontractor. Not so. Subcontractor's owner testified that as of the end of 2013, Prime Contractor had paid $398,714.94 to Subcontractor or its suppliers. Although there was evidence Prime Contractor subsequently made additional payments to Subcontractor's suppliers or subcontractors, these payments were made after December 31, 2013, the relevant date identified on the jury's verdict form.[12]

---

[11] Prime Contractor also points to a portion of a pay application submitted to the City and argues that it lists all approved change orders but does not include Subcontractor's change orders, thereby purportedly demonstrating Prime Contractor did not bill the City for any of Subcontractor's change orders. Prime Contractor cites no record evidence supporting its assertion that the cited pay application lists all approved change orders for the Project. Moreover, Prime Contractor's project manager testified Subcontractor was paid for all approved change order work performed in 2012 and early 2013.

[12] Prime Contractor argues the trial court erred in awarding prompt payment penalties through the date of judgment for payments Prime Contractor made to Subcontractor shortly after December 31, 2013. The contention is forfeited: Prime Contractor raised it for the first time in its

18

Prime Contractor argues the jury's adoption of Subcontractor's calculations, including a minor mathematical error contained therein (see *ante,* fn. 10), shows the jury did not independently evaluate the evidence. Prime Contractor does not assert—much less provide supporting record citations—that it alerted the jury to this error. We will not conclude the jury's failure to catch a minor mathematical error that the opposing party also apparently did not catch establishes the jury failed to independently evaluate the evidence.

Finally, Prime Contractor contends the City had not paid Prime Contractor withheld retention as of December 31, 2013, so the amount of such retention owed to Subcontractor should not have been considered for purposes of Business and Professions Code section 7108.5.[13] We agree with this contention. Prime Contractor's December 2013 pay application to the City demonstrates that the City retained 5 percent of the value of all

---

reply brief and fails to provide record citations demonstrating it raised the objection below. (*Tellez v. Rich Voss Trucking, Inc.* (2015) 240 Cal.App.4th 1052, 1066 [" ' " 'points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before' " ' "]; *Avalos v. Perez* (2011) 196 Cal.App.4th 773, 776 ["As a general rule, a claim of error will be deemed to have been forfeited when a party fails to bring the error to the trial court's attention by timely motion or objection."].)

[13] "As a[] . . . hedge against nonperformance and incentive for completion, an owner may withhold a small percentage of the money due at each stage—typically 5 to 10 percent—until the project is finished. [Citations.] If the contractor defaults, or subcontractors assert mechanics liens for nonpayment, the owner can use this retention fund to make payment or seek substitute performance. [Citations.] Once work is done to the owner's satisfaction and the period for filing liens has expired, the owner will release the retention." (*United Riggers, supra,* 4 Cal.5th at pp. 1087–1088, fn. omitted.)

completed work, and Prime Contractor's January 2015 pay application demonstrates the retention was still unpaid at that time.[14]  The jury adopted Subcontractor's calculations, which did not account for this withheld retention.  The jury's verdict indicates it found Prime Contractor billed the City $656,036.04 plus $6,331.40 for work performed by Subcontractor; as discussed above, we are reducing this by $693.75 for Contract work not completed.  5 percent of this amount is $33,083.68, and the amount of withheld payment subject to prompt payment penalties should be reduced by this amount.  We will reverse and remand the prompt payment penalties to be recalculated accordingly.

D.    *Documentary Exhibits*

Prime Contractor argues certain documentary exhibits were improperly admitted to its prejudice.[15]  We reject the challenge.

The challenged documents, Exhibits 15 and 16, were spreadsheets prepared by Subcontractor's owner, Bruce Volpe, to summarize his account of Subcontractor's billings to Prime Contractor and Prime Contractor's payments to Subcontractor.[16]  Prime Contractor raised hearsay objections to the admission of both documents.  After Mr. Volpe testified about the billings and payments listed in the exhibits, the trial court admitted the documents but instructed the jury that "these numbers are in dispute.  So they are not

---

[14] Although Prime Contractor asserts the City withheld an additional 2.5 percent, the record citations provided do not support this claim.

[15] Prime Contractor primarily raises this challenge with respect to the jury's damages award, which will be vacated as a result of our reversing the breach of contract judgment.  However, Prime Contractor also indicates the documents were used to support the prompt payment amount.

[16] Exhibit 16 was a corrected version of Exhibit 15.

20

being offered for the truth at this time. This is simply a document created by the witness to calculate what he believes is owed to him."

Prime Contractor argues the records were not admissible under the business records hearsay exception. (Evid. Code, § 1271.) The records were not admitted for the truth, and therefore did not need to satisfy the business records exception or any other hearsay exception. (Evid. Code, § 1200, subd. (a) [" 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated."].)

Prime Contractor also argues that the exhibits may have been used to refresh Mr. Volpe's recollection, but such use did not render them independently admissible. (See *Vogelsang v. Wolpert* (1964) 227 Cal.App.2d 102, 126–127 [" 'When a party produces a witness who uses a writing to revive present recollection, or as a record of past recollection, the writing may not be introduced in evidence by that party.' "].) The documents were not admitted for the truth, and Prime Contractor does not challenge either the use of the exhibits to refresh Mr. Volpe's recollection or Mr. Volpe's testimony regarding the billings and payments listed on the exhibits. Accordingly, Prime Contractor has failed to demonstrate it was prejudiced by any error in admitting the documents. (See Evid. Code, § 353.)[17]

III.    *Attorney Fees*

Prime Contractor argues the trial court erred in awarding contractual attorney fees pursuant to Civil Code section 1717. Because we are reversing the judgment on Subcontractor's breach of contract claim, the attorney fee order is also reversed and we need not and do not decide this issue. (*Merced*

---

[17] We reject Prime Contractor's contention that the trial court's errors cumulatively prejudiced it.

*County Taxpayers' Assn. v. Cardella* (1990) 218 Cal.App.3d 396, 402 [an order awarding attorney fees "falls with a reversal of the judgment on which it is based"].)

## DISPOSITION

The judgment is reversed and remanded as follows: (1) the breach of contract judgment is reversed and remanded for retrial; (2) the award of prompt payment penalties is reversed and remanded for recalculation based on $229,774.57 of unpaid payments[18]; and (3) the fee award is reversed. The parties shall bear their own costs on appeal.

_____
SIMONS, Acting P. J.

We concur.

_____
NEEDHAM, J.

_____
RODRIGUEZ, J.*

(A157577, A159372)

_____

[18] $263,552 minus $693.75 minus $33,083.68.

* Judge of the Superior Court of Alameda County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.